No. 25-1801

# United States Court of Appeals for the First Circuit

BRUNO PROJECT RESCUE, INC., *ET AL*

Plaintiffs-Appellants,

*v.*

CENTERS FOR DISEASE CONTROL AND PREVENTION, *ET AL*,

Defendants-Appellees.

ON APPEAL FROM FINAL JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, CASE NO. 24-cv-11522 (CASPER, C.J.)

## APPELLANTS' OPENING BRIEF

Aaron M. Katz (1st Cir. No. 1170921)
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
T: (617) 915-6305
akatz@aaronkatzlaw.com

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................ …..iii

**RULE 26.1 DISCLOSURE STATEMENT** ..................................... ……1

**JURISDICTIONAL STATEMENT** ................................................ ……2

**STATEMENT OF THE ISSUES** ................................................. ……3

**STATEMENT REGARDING ORAL ARGUMENT** ................................. ……5

**STATEMENT OF THE CASE** ....................................................... ……6

1. The CDC's Pre-August 1, 2024 Dog Importation Regulations ..................... ……6

2. The CDC's May 13, 2024 Rulemaking ........................................ ……8

3. The Impact of the Age Requirement on Appellants' Rescue Efforts .......... …..12

4. Appellants' Lawsuit, and the Decision Below ............................... …..14

**STANDARD OF REVIEW** ........................................................... …..16

**SUMMARY OF THE ARGUMENT** ............................................... …..18

**ARGUMENT**........................................................................... …..21

I. 42 U.S.C. § 264(a) Does Not Authorize an Indiscriminate Six-Month Age Requirement on All Dogs Regardless of Provenance …........................................21

II. The Six-Month Age Requirement Is Arbitrary and Capricious as Applied to Dogs Arriving From Rabies-Free Caribbean Islands. ............................................... …..26

    A. The CDC Failed to Appropriately Consider the Reliance Interests on Its Prior Regulations…………………………………………………..26

    B. The Age Requirement as Applied to Dogs from Rabies-Free Caribbean Islands Lacks a Rational Connection to the Evidence…………………………28

**CONCLUSION** ......................................................................... …..35

**ADDENDUM**

District Court Summary Judgment Memorandum and Order…………………...Add. 1

District Court Final Judgment………………………….………………Add. 16

42 U.S.C. § 264 ……………………………………………………..Add. 17

42 U.S.C. § 265……………………………………………………...Add. 19

42 C.F.R. § 71.51 (post-August 1, 2024 version) …………………….…Add. 20

# TABLE OF AUTHORITIES

**CASES**

*Administracion Para El Sustento de Menores v. HHS,*
588 F.3d 740 (1st Cir. 2009) ................................................................. 16

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
141 S. Ct. 2485 (2021) ........................................................................ 22

*Ala. Ass'n of Realtors v. U.S. HHS,*
2021 U.S. App. LEXIS 16630 (D.C. Cir. 2021) ................................. 28

*Ala. Ass'n of Realtors v. United States HHS,*
539 F. Supp. 3d 211 (D.D.C. 2021) .................................................... 18

*Associated Fisheries of Maine, Inc. v. Daley,*
127 F.3d 104 (1st Cir. 1997) ......................................................... 17, 28

*Brown v. Sec'y of U.S. HHS,*
4 F.4th 1220 (11th Cir. 2021)........................................................ 21, 22

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ....................................................................... 17, 28

*Butte City v. Hogen,*
613 F. 3d 190 (D.C. Cir. 2010) .......................................................... 29

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ........................................................................... 26, 27

*District of Columbia v. U.S. Dep't of Agric.,*
444 F. Supp. 3d 1 (D.D.C. 2020) ....................................................... 28

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016). ...................................................................... 26, 27

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................................ 26

*Florida v. Becerra,*
544 F. Supp. 3d 1241 (M.D. Fla. 2021) ............................................. 29

iii

*Huisha-Huisha v. Mayorkas*,
    642 F. Supp. 3d 1 (D.D.C. 2022) ............................................................... 18

*Loper Bright Enterprises, Inc. v. Raimondo*,
    603 U.S. 369 (2024). ................................................................................... 17

*Louisiana v. Becerra*,
    577 F. Supp. 3d 483 (W.D. La. 2022) ........................................................ 18

*Mackey v. Lanier Collection Agency & Serv.*,
    486 U.S. 825 (1988) ..................................................................................... 25

*Melone v. Coit*,
    100 F.4th 21 (1st Cir. 2024) .................................................................. 17-18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................... 17, 26, 28

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
    595 U.S. 109 (2022) ................................................................................ 16-17

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ...........................................................*passim*

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .................................................................................. 17-18

*Texas v. Becerra*,
    667 F. Supp. 3d 252 (N.D. Tex. 2023) ....................................................... 18

*Tiger Lily, LLC v. United States HUD*,
    5 F.4th 666 (6th Cir. 2021) .................................................................... 18, 22

*Tourus Records, Inc. v. DEA*,
    259 F.3d 731 (D.C. Cir. 2001) .................................................................... 29

*Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*,
    447 F.3d 68 (1st Cir. 2006) ......................................................................... 16

**STATUTES AND REGULATIONS**

5 U.S.C. § 706 ................................................................................................. 16

iv

42 U.S.C. § 264.................................................................................*passim*

42 U.S.C. § 265................................................................... 20, 24, 25

42 C.F.R. § 71.51.............................................................................*passim*

## ADMINISTRATIVE MATERIALS

21 Fed. Reg. 9879 (Dec. 12, 1956)........................................................ 6

84 Fed. Reg. 724 (Jan. 31, 2019)......................................................... 8

86 Fed. Reg. 32041 (June 16, 2021).................................................. 11

88 Fed. Reg. 43570  (July 10, 2023)……………………………………11

89 Fed. Reg. 41726 (May 13, 2024) (included in Record Appendix)............. *passim*

## OTHER AUTHORITIES

Raybern *et al*, Rabies in a Dog Imported from Egypt – Kansas, 2019, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6938a5.htm (last visited December 11, 2025). ....................................................................... 30

## RULE 26.1 DISCLOSURE STATEMENT

Each appellant is a privately-held 501(c)(3) corporation.  None is affiliated with or owned by any publicly traded corporation.

1

## STATEMENT OF JURISDICTION

This case involves an Administrative Procedure Act challenge to a final agency action of the United States Centers for Disease Control and Prevention—specifically, a final regulation enacted through informal, notice-and-comment rulemaking.  The district court had jurisdiction pursuant to 5 U.S.C. § 704 and 42 U.S.C. § 1331.  The district court granted summary judgment and entered final judgment in favor of the defendants-appellees on June 18, 2025.  *See* Add. 1-16.  Appellants timely filed their notice of appeal on August 16, 2025. *See* App. 24.

## STATEMENT OF THE ISSUES

On May 13, 2024, the Centers for Disease Control and Prevention ("CDC") published a new regulation that prohibits *any dog* under six months of age from entering the United States from *any foreign country*, without exception. *See* 89 Fed. Reg. 41726, 41727 (May 13, 2024), App. 27.[1] The CDC asserts that the six-month age requirement, even as applied to dogs from rabies-free countries, is necessary to prevent the canine variant of rabies ("dog rabies") from being reintroduced into the United States. The age requirement, however, applies even to puppies that have spent all of their young lives in a foreign country that the CDC has declared to be completely free of rabies and that does not present any actual rabies risk. And it makes no difference whether the dog is seeking to enter the United States in the physical custody its U.S.-citizen owner. If the dog is younger than six months, the dog is automatically turned away.

Appellants are U.S.-based dog rescue organizations that re-home dogs rescued from the streets of Caribbean islands that the CDC has deemed to be free of dog rabies. Appellants arrange for the rescued dogs to be fostered on their native islands until they are permanently adopted. Most of the permanent adoptive families are located in the United States.

---

[1] The CDC's May 13, 2024 rulemaking is reproduced in the Record Appendix at App. 26-148. When citing that rulemaking, this brief references both the Federal Register and Appendix pages.

3

The CDC's six-month age requirement has been devastating to Appellants' rescue efforts, because it delays the permanent adoption of the dogs that Appellants rescue. These delays increase Appellants' fostering costs and strain Appellants' scarce fostering resources. Moreover, because many families have a strong preference for adopting a dog while it is still a puppy, the inability to place a dog with a permanent adoptive family in the U.S. until it is at least six months old makes it more difficult for Appellants to match each rescued dog with a "forever home." Appellants thus sued to have the six-month age requirement declared unlawful under the Administrative Procedure Act, at least as applied to dogs from the rabies-free Caribbean islands on which Appellants focus their rescue efforts. The district court granted summary judgment in favor of the defendants. This appeal presents the following issues:

1.     Whether 42 U.S.C. § 264(a) provides the CDC with statutory authority to impose a six-month age requirement on dogs arriving to the United States from Caribbean islands that the CDC has declared to be rabies-free.

2.     Whether the six-month age requirement, as applied to dogs arriving from rabies-free Caribbean islands, is arbitrary and capricious given the CDC's failure to identify any evidence that can rationally support the conclusion that applying the requirement to such dogs is necessary to prevent dog rabies from being re-introduced to the United States.

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully request that the Court hold oral argument. This appeal presents an issue of significant public importance, and this Court will be the first to address on the merits whether the CDC's indiscriminate six-month age requirement is a lawful exercise of the CDC's powers as applied. Appellants believe oral argument will assist the Court's understanding of the facts and the legal issues.

**STATEMENT OF THE CASE**

**1.    The CDC's Pre-August 1, 2024 Dog Importation Regulations**

In 1944, Congress passed the Public Health Service Act (the "Act"). Through the statutory provision codified at 42 U.S.C. § 264, the Act empowers the Surgeon General to enact certain types of regulations necessary to prevent the introduction or spread of communicable diseases. Section 264(a), which is composed of two sentences, provides in relevant part:

> The Surgeon General, with the approval of the Secretary [of the Department of Health and Human Services] is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States . . . . For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human being, and other measures, as in his judgment may be necessary.

42 U.S.C. § 264(a). In 1956, the Surgeon General exercised this statutory power to enact regulations governing the importation of dogs from foreign countries (the "1956 regulations"). *See generally* 21 Fed. Reg. 9879 (Dec. 12, 1956). In 1985, the CDC—the agency to which the Surgeon General had by then delegated his § 264 rulemaking power—updated the 1956 regulations in part.

In the main, the 1956 regulations, as updated in 1985, imposed two admission requirements on dogs arriving to the United States from a foreign country: (i) the

6

dog had to appear healthy at the port of entry, and (ii) the dog was required either to have a "valid rabies vaccination certificate" or be exempt from the rabies vaccination requirement.[2]  *See* 42 C.F.R. § 71.51(b)(1) and (c)(1) (pre-August 1, 2024 version). A "valid rabies vaccination certificate" was defined as "a certificate which was issued for a dog not less than 3 months of age at the time of vaccination and which: (1) Identifies [the] dog on the basis of [specified] identifying information. (2) Specifies a date of rabies vaccination at least 30 days before the date of arrival of the dog at a U.S. port. (3) Specifies a date of expiration which is after the date of arrival of the dog at a U.S. port. (4) Bears the signature of a licensed veterinarian." 42 C.F.R. § 71.51(a) (pre-August 1, 2024 version).  A dog was exempt from the rabies vaccination requirement if "the owner submit[ted] evidence satisfactory to the Director that (i) If the dog is less than 6 months of age, it has been only in a country determined by the Director to be rabies-free; or (ii) If a dog is 6 months of age or older, for the 6 months before arrival, it has been only in a country determined by the Director to be rabies-free." 42 C.F.R. § 71.51(a) (pre-August 1, 2024 version). The net effect of these regulations was that dogs arriving from countries that CDC

---

[2] Dogs arriving to the United States for purposes of re-sale are also subject to regulations that the U.S. Department of Agriculture has enacted under the Animal Welfare Act.  Those Animal Welfare Act regulations are not at issue in Appellants' lawsuit or this appeal.  Appellants do not import dogs into the United States for purposes of re-sale.  Appellants place rescued dogs with U.S.-based "forever homes," and the dogs enter the United States after being paired with their permanent adoptive families.

had not deemed to be rabies-free could not enter the United States until at least four months of age, while dogs arriving from countries that the CDC had deemed to be rabies-free could enter at any age.[3]

The 1956 regulations also entitled the CDC to deny entry to any dog being imported from a country that the CDC deemed to be present a high-risk of dog rabies ("rabies high-risk countries"), or to temporarily suspend dog imports from such countries. 42 C.F.R. § 71.51(e) and § 71.63 (pre-August 1, 2024 version). The CDC exercised this power from time to time, including from June 2021 through July 2024.

### 2.    The CDC's May 13, 2024 Rulemaking

The 1956 regulations were successful in helping eradicate dog rabies from the United States. In 2007, the CDC declared the United States to be free of dog rabies. *See* 89 Fed. Reg. 41726, 41726 n.1 (May 13, 2024), App. 26. Since that time, tens of millions of dogs have entered the United States from foreign countries, including tens of thousands from the rabies-free Caribbean islands on which Appellants' rescue efforts are focused. There has not been a single documented instance of a rabies-infected dog entering the United States from any of those islands.

---

[3] In 2019, the CDC clarified that "rabies-free" for purposes of § 71.51(a)'s vaccination exemption meant free of the dog variant of rabies. 84 Fed. Reg. 724 (Jan. 31, 2019). This clarification broadened the scope of the vaccination exemption and, therefore, the countries from which dogs were not subject to any age requirement.

Nevertheless, on May 13, 2024, after notice-and-comment, the CDC published a new regulation that imposed an across-the-board, no-exceptions entry ban any dog less than six months of age. Under the six-month age requirement, which became effective on August 1, 2024, healthy dogs born and raised in rabies-free countries are now disqualified from entering the United States until six months of age. *See* 89 Fed. Reg. 41726, 41727 (May 13, 2024), App. 27; 42 C.F.R. § 71.51(f) (post-August 1, 2024 version). The age requirement even applies to specialty breed dogs that are primarily or exclusively bred in rabies-free European countries, which prior to August 1, 2024 could enter the United States at any age so long as the adoption was consummated prior to entry (*i.e.*, so long as they were not being imported for re-sale).

In the portion of its rulemaking statement entitled "Purpose of This Regulatory Action," the CDC justified its abrupt regulatory change on two grounds. First, the CDC stated that it was "revising its regulation at 42 CFR 71.51 to prevent the reintroduction and spread of dog-maintained rabies virus variant (DMRVV) in the United States." 89 Fed. Reg. 41726, 41726 (May 13, 2024), App. 26. Second, the CDC stated that the new regulation "also seeks to prevent and deter the importation of dogs with falsified or fraudulent rabies vaccine documentation." *Id.*

The CDC's May 13, 2024 rulemaking, however, did not enact any new rabies vaccination requirement on dogs arriving to the United States from countries that the

9

CDC deems to be free of dog rabies. Thus, even under the CDC's new regulations, a dog arriving to the United States from a rabies-free country remains exempt from any rabies-vaccination requirement. *See, e.g.*, 89 Fed. Reg. 41726, 41776 (May 13, 2024) (stating that "proof of rabies vaccination" is "recommended but not required" for dogs arriving from rabies-free countries), App. 26. Because dogs arriving to the United States from rabies-free countries are not required to present *any* rabies vaccine documentation to enter, it is illogical for the CDC to assert that its new regulation—at least as applied to dogs arriving from rabies-free countries—will deter vaccine-documentation fraud.

The CDC's May 13, 2024 rulemaking also did not identify a single instance in which a dog born and raised in a rabies-free country either (i) arrived at a United States port of entry infected with rabies, or (ii) was found to be infected with rabies after entering the United States. Nor does any such example appear in the voluminous administrative record. Thus, the CDC lacked any evidentiary basis to assert that the new six-month age requirement, at least as applied to dogs arriving from rabies-free countries, was a necessary rabies-prevention or rabies-reduction measure.

The CDC's May 13, 2024 rulemaking also did not identify a single instance in which a dog arriving to the United States from a rabies-free country in fact was from another country and merely had been "pit stopped" in the rabies-free country

10

to conceal its true provenance. Nor does such an example appear in the voluminous administrative record. Thus, the CDC lacked any evidentiary basis to assert that the new six-month age requirement, as applied to dogs arriving from rabies-free countries, was a rational response to documented instances of fraud regarding imported dogs' provenances.

Finally, the CDC's May 13, 2024 rulemaking actually *relaxed* the prior import restrictions that applied to dogs arriving to the United States from countries that the CDC deems to present a high risk of dog rabies. Beginning in June 2021, the CDC imposed a suspension on the importation of any dog arriving from "rabies high-risk" countries, regardless of age and regardless of vaccination status. *See, e.g.*, 86 Fed. Reg. 32041 (June 16, 2021) (imposing the suspension); 88 Fed. Reg. 43570, 43572 (July 10, 2023) (extending the suspension through July 2024). The suspension was based on evidence that dogs arriving from rabies high-risk countries were sometimes skirting the rabies vaccination certificate requirement by presenting "incomplete, inadequate, or fraudulent rabies vaccination certificates . . . ." *Id.* Perplexingly, in its May 13, 2024 rulemaking, the CDC announced that it would allow the suspension on the importation of dogs from rabies high-risk countries to expire, which meant that the importation rules for such dogs would revert to the more lax pre-June 2021 regulatory regime over which the CDC had expressed consternation. *See* 89 Fed. Reg. 41726, 41738 (May 13, 2024), App. 38.

11

### 3. The Impact of the Age Requirement on Appellants' Rescue Efforts

Appellants are U.S.-based dog rescue organizations that focus their efforts on rescuing and re-homing stray dogs that live on Caribbean islands that the CDC has deemed to be rabies-free.[4] These dogs are affectionately known as "Potcakes," a reference to the caked-on peas and rice at the bottom of locals' cooking pots that locals traditionally fed to stray dogs wandering the neighborhoods. When Appellants rescue a dog from the island streets, they arrange for the dog to be fostered by an individual living on the island. Appellants then work to find a family willing and able to permanently adopt the dog. The overwhelming majority of the permanent adopters with whom Appellants place their rescued Potcakes reside in the United States. Appellants collectively have placed tens of thousands of rescued Potcakes with U.S. "forever homes" over the past decade.

The Potcakes that Appellants rescue commonly are puppies (and oftentimes just a couple of weeks old) at the time of rescue. Appellants arrange for and fund the puppies' on-island fostering until they can be transported to their "forever homes." Prior to the CDC's May 13, 2024 rulemaking, Appellants typically would seek to place rescued puppies with their forever homes by 12 to 16 weeks of age,

---

[4] The Caribbean islands that the CDC has deemed to be free of dog rabies are: Anguilla, Antigua, Aruba, Bahamas, Barbados, Barbuda, Cayman Islands, Dominica, Guadeloupe (including St. Bart and St. Martin), Jamaica, Martinique, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Turks and Caicos, Trinidad and Tobago, and the Virgin Islands (U.S. and U.K.).

which has long been considered the ideal age for adoption and an age at which a Potcake puppy is still small enough to travel with its new parent via the passenger fuselage of a commercial airplane (rather than in cargo).

Under the CDC's new regulations, however, a rescued Potcake cannot enter the United States until it is at least six months of age. This has substantially harmed Appellants' rescue efforts for at least three reasons. First, because puppies that Appellants rescue must now remain on-island until they are at least six months of age, Appellants must foster those puppies for longer than they previously did. Because on-island foster homes are a scarce resource, the need to foster each rescued puppy for longer means that Appellants are able to rescue fewer dogs overall. Second, because families generally prefer to adopt Potcakes when they are younger than six months, the CDC's new regulations make it more difficult for Appellants to match rescued dogs with forever homes. Third, because Appellants are able to rescue and re-home fewer dogs than they could under CDC's prior regulations, Appellants have a more difficult time raising money from donors. A reduced ability to raise charitable funding means a reduced ability to rescue and re-home Potcakes. This then begets further fundraising difficulties, throwing Appellants' into a veritable death spiral.

13

####     4.        Appellants' Lawsuit, and the Decision Below

Appellants filed their lawsuit on June 13, 2024—a month after the CDC published the new regulations but roughly seven weeks before they went into effect. Appellants filed an amended complaint on June 19, 2024.  *See* App. 149-170. On January 21, 2025, Appellants moved for summary judgment, asking the district court to "enter an order finding that, as applied to dogs entering the United States from Caribbean islands that the CDC designates as dog rabies-free, the [six month age] requirement is outside the CDC's statutory authority under 42 U.S.C. § 264(a) . . . and in any event is arbitrary and capricious."  App. 171-173. Appellees cross-moved for summary judgment. *See* App. 174-175.

The district court concluded that the CDC's six-month age requirement is within the agency's statutory authorization under 42 U.S.C. § 264(a).  The district court also concluded that, even as-applied to dogs arriving from rabies-free Caribbean islands, the six-month age requirement is not arbitrary and capricious. *See* Add. 1-16.

With respect to whether § 264(a) authorizes the CDC to impose a six-month age requirement, the district court addressed the question on a facial rather than on an as-applied basis.   The district court held that imposing a six-month age requirement is, as a facial matter, within the ambit of the CDC's § 264(a) powers because it helps "to facilitate" the visual health inspection that 42 C.F.R. § 71.51(i)

14

requires border patrol agents to conduct before allowing any dog through a port of entry,[5] and because it makes it easier for border patrol agents to "determine that the animal matches its documentation." Add. 10-11. The district court thus concluded that, even if an age requirement "cannot be characterized as an inspection requirement" *per se*, it falls within § 264(a)'s "catchall provision for 'other measures' . . . ." Add. 11.

With respect to whether the six-month age requirement is arbitrary and capricious, the district court agreed to address the requirement on an as-applied basis. The district court implicitly acknowledged that the CDC had failed to identify a single specific instance of (i) a rabies-infected dog entering the United States from any of the Caribbean islands that the CDC has declared to be rabies-free, or (ii) rabies-related fraud (*e.g.*, fraud regarding the dog's vaccination status or provenance) connected with any of those islands. The district court concluded, however, that because of the "risk" that dog rabies poses in the abstract and the theoretical "incentive that would exist to divert dogs from high-risk countries through low-risk or rabies-free countries if those countries were subject to different age restrictions for dog imports, the CDC's decision to move forward without such specific documentary evidence is not arbitrary and capricious." Add. 13-14.

---

[5] The district court credited the CDC's assertion that it is easier to determine on a visual inspection whether a dog is rabid if it is older than six months. *See* Add. 10.

15

In deciding that the six-month age requirement is not arbitrary or capricious even as applied to dogs from rabies-free Caribbean islands that have never been connected with an incident of rabies or rabies-related fraud, the district court failed to address that imports from high-risk countries had been suspended completely since June 2021, and yet there still were no documented instances of unscrupulous importers attempting to fraudulently divert (let alone *successfully* diverting) dogs from high-risk countries through the rabies-free Caribbean islands. The district court also failed to address that rabies high-risk and rabies-free countries had been subject to different age and vaccination requirements *for decades* under the 1956 regulations, without any evidence that dogs from high-risk countries were being fraudulently diverted through rabies-free Caribbean islands.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's summary judgment decision. *See Administracion Para El Sustento de Menores v. HHS*, 588 F.3d 740, 744 (1st Cir. 2009). Because Appellants' lawsuit is brought under the Administrative Procedure Act, "'judicial review, even at the summary judgment stage, is narrow.'" *Id.* (quoting *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006)). The Administrative Procedure Act provides that a reviewing court "shall hold unlawful and set aside" an agency's final regulation if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

16

law;" or if it is "in excess of [the agency's] statutory jurisdiction, authority, or limitations . . . ." 5 U.S.C. § 706(2)(A), (C).

A regulation is outside an agency's statutory authority if it is not within the power that Congress delegated to the agency by statute. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). The Supreme Court's recent decision in *Loper Bright Enterprises, Inc. v. Raimondo* directs reviewing courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." 603 U.S. 369, 412-413 (2024). In other words, this Court does not defer to the agency's own interpretation of the underlying statute.

By contrast, review for arbitrariness and capriciousness is a "deferential standard" under which an "agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example, if the agency . . . offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

17

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  Moreover, "[t]he grounds upon which an [agency's action] must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see also Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) ("It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale.").

## SUMMARY OF THE ARGUMENT

Over the past five years, federal courts repeatedly have found that the CDC exceeded its statutory authority or abused its discretion in issuing sweeping regulations in the name of public health.  *See, e.g.*, *Tiger Lily, LLC v. United States HUD*, 5 F.4th 666 (6th Cir. 2021) (holding that the CDC lacked the "sweeping authority" to impose a residential eviction moratorium); *Ala. Ass'n of Realtors v. United States HHS*, 539 F. Supp. 3d 211 (D.D.C. 2021) (enjoining CDC's residential eviction moratorium); *Louisiana v. Becerra*, 577 F. Supp. 3d 483 (W.D. La. 2022) (holding that CDC's vaccine mandate was unlawful); *Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1 (D.D.C. 2022) (holding that the CDC's suspension of land border crossings from Mexico and Canada was arbitrary and capricious); *see also Texas v.*

18

*Becerra*, 667 F. Supp. 3d 252 (N.D. Tex. 2023) (enjoining an HHS vaccine mandate).

This case concerns the CDC's latest misguided and unlawful regulation—an unprecedented, indiscriminate requirement that any dog must be at least six months of age to enter the United States from a foreign country. As applied to dogs arriving to the United States from rabies-free countries, this age requirement marks a substantial change from the CDC's dog import regulations that had been in place for decades. Those prior regulations not only engendered substantial reliance interests from Appellants and others similarly situated, but they also had been successful in helping eradicate dog rabies from the United States.

Particularly as applied to dogs arriving to the United States from the rabies-free Caribbean islands that are the focus of Appellants' work and their lawsuit, the CDC's new six-month age requirement is not rationally necessary to prevent or mitigate the risk that dog rabies will be re-introduced to the United States. The CDC failed to identify a single instance of any rabies-infected dog ever entering the United States from any of those countries. The CDC also failed to identify any facts that could give rise to a non-speculative concern that those countries might be a source of rabies-infected dogs or rabies-related fraud in the future but for the new six-month age requirement.

19

At bottom, this is an "absence of evidence case," presenting this Court with the question of whether the Administrative Procedure Act permits an agency to drastically revise its prior regulations based on speculative concerns regarding theoretical risks and harms that have never actually manifested in the way that the agency hypothesizes they could. The Court should answer that question with a resounding no, reverse the decision below, and remand the case with instructions to enter summary judgment in favor of Appellants.

There are two reasons why this Court should reverse the decision below. *First*, as applied to dogs arriving to the United States from Caribbean islands that the CDC has long declared to be rabies-free, the six-month age requirement is outside the CDC's statutory authority under 42 U.S.C. § 264(a), because it is neither an inspection measure nor an inspection-like measure that directly targets the prevention of any communicable disease. Instead, the six-month age requirement essentially functions as the type of prophylactic import prohibition that is only authorized by 42 U.S.C. § 265, which requires very exacting country-specific findings of fact that the CDC did not (and cannot) make with respect to the rabies-free countries at issue here. *Second*, as applied to dogs arriving from rabies-free Caribbean islands, the six-month age requirement is arbitrary and capricious because the CDC identified no actual evidence that the requirement is necessary to prevent the re-introduction of dog rabies into the United States. Instead, the CDC surmised

that an indiscriminate six-month age requirement is necessary to deter far-fetched, hypothetical scenarios of fraud that never occurred under the CDC's prior regulations. That is woefully insufficient to satisfy the Administrative Procedure Act's deferential standard of review.

## ARGUMENT

This Court should hold that, as applied to dogs arriving from the rabies-free Caribbean islands on which Appellants focus their rescue efforts, the CDC's indiscriminate six-month age requirement is a prophylactic entry ban that is both outside the CDC's § 264(a) authority and arbitrary and capricious.

## I. 42 U.S.C. § 264(a) Does Not Authorize an Indiscriminate Six-Month Age Requirement on All Dogs Regardless of Provenance.

The first sentence of 42 U.S.C. § 264(a) empowers the CDC to enact regulations that are "necessary" to "prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States . . . ." 42 U.S.C. § 264(a). The appellate courts uniformly have held that this sentence "should be read in light of the other provisions of § 264—that is, as granting the Director of the CDC general rulemaking power, subject to the specific limitations set out immediately following the grant." *Brown v. Sec'y of U.S. HHS*, 4 F.4th 1220, 1248 (11th Cir. 2021). Thus, a court must "read the first sentence of § 264(a) as providing the Director of the CDC with general rulemaking authority, subject to the specific limitations set out in the second sentence of § 264(a)." *Id.* at 1250;

21

The second sentence of § 264(a) begins by enumerating six types of action that the CDC may take to prevent the spread of a communicable disease: "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings . . . ." 42 U.S.C. § 264(a). The second sentence concludes by permitting the CDC also to take "other measures" that in the CDC's "judgment may be necessary." *Id.* Because, however, § 264(a)'s second sentence must be read as complementary to its first sentence, the "other measures" must be necessary not just in some abstract sense, but rather necessary to prevent the introduction, transmission, or spread of communicable diseases.

Moreover, as the Sixth Circuit held in *Tiger Lily,* the "'other measures' envisioned in the statute are measures like" the ones that the second sentence of § 264(a) specifically enumerates. 992 F.3d at 522-523; *accord Brown*, 4 F.4th at 1250 (holding that the phrase "'other measures'" must be "'construed to embrace only objects similar in nature'" to the six specifically enumerated measures (quoting *Tiger Lily,* 992 F.3d at 522)). Thus, "'other measures' must be measures like inspection, fumigation, disinfection, sanitation, pest extermination, or destruction of animals or articles found to be sources of dangerous infection." *Id.* at 1250-1251.

Furthermore, § 264(a) does not permit the CDC to impose an "inspection" requirement in some generic sense. Rather, any inspection requirement must be for

the specific and limited purpose of "identifying, isolating, and destroying" a communicable disease. *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2488 (2021). Thus, in *Alabama Association of Realtors*, the Supreme Court explained that § 264(a) does not permit the CDC to enact requirements (whether labeled as "inspection" requirements or otherwise) that would only "indirectly" effect the spread of communicable disease; instead, the statute permits only the "the direct targeting of disease . . . ." *Id.*

The district court below held that, to the extent the six-month age requirement helps "to facilitate" border patrol agents' visual rabies inspections of arriving dogs, the age requirement is authorized by § 264(a)'s "other measures" provision, which the district court characterized as a "catchall." Add. 10-11. The flaw in the district court's logic is that dogs legitimately arriving to the United States from a foreign country that the CDC has declared to be rabies-free will *definitely not* be infected with rabies. Thus, in the context of a dog legitimately arriving from one of those countries, the age requirement cannot logically be characterized as "facilitating" an inspection for a disease that the dog might potentially be carrying.[6] The district court elided this point by incorrectly treating the question of the CDC's statutory authority

---

[6] To the extent the border patrol agent has concerns that the dog's provenance is being misrepresented, the dog can be denied entry for that reason, regardless of the dog's age or apparent health.

23

to enact a six-month age requirement as a question that must be answered on a facial basis. The question, however, clearly can be answered on an as-applied basis. If a dog is legitimately arriving from a country in which rabies is not present, the outcome of any visual inspection is a foregone conclusion—the dog definitely does not have rabies. Thus, as applied to such a dog, an age requirement does nothing to "facilitate" the visual rabies inspection.[7] To say otherwise would be tantamount to saying that the final basket that the winning basketball team scored in a blowout victory facilitated the win.

The district court also credited the CDC's assertion that the six-month age requirement makes it easier for border patrol agents to confirm that the dog presented at the port of entry is the same dog described on the import paperwork that the owner must provide. *See* Add. 10. The flaw in this logic is that the CDC's regulations require all dogs to be microchipped as a condition of entry. *See* 89 Fed. Reg. 41726, 41727 (May 13, 2024), App. 27. Thus, if there is any doubt about whether the dog presented to the border patrol agent is not the dog described on the import paperwork, that doubt is resolved not through a visual inspection, but by scanning

---

[7] Nor can the CDC coherently argue that the age-requirement provides certainty regarding the dog's vaccination status. This is because dogs from rabies-free countries are not required to be vaccinated against rabies at the time of entry, do not have to present a serological titer test showing rabies immunity, and do not have to present rabies vaccination paperwork.

24

the dog's subcutaneous microchip and confirming it matches the microchip information on the import paperwork.

A more apt description of the CDC's six-month age requirement is that it is a prophylactic import prohibition that applies to any dog that is a member of a broadly-defined class (*i.e.*, any dog less than six months old). That the import prohibition has a temporal element to it—that is, a dog is not subject to the prohibition once it reaches six months of age—is beside the point. There is a statute that clearly addresses the CDC's authority to impose a prophylactic import prohibition. The statute is 42 U.S.C. § 265. Section 265 authorizes the CDC to prohibit the importation of any animal arriving from countries that the CDC specifically "determines" present a "serious danger" of introducing a communicable disease into the United States. 42 U.S.C. § 265. The CDC did not make any country-specific findings of fact here, nor could it plausibly make those findings of fact with respect to the rabies-free Caribbean islands that are the focus of Appellants' rescue efforts.

The CDC should not be permitted to shoehorn into § 264(a) an age requirement that should be deemed subject to § 265's country-specific fact-finding requirements. *Cf. Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."). The Court should hold that the CDC's § 264(a) authority includes the authority to impose an age

25

requirement only with respect to dogs arriving from a country that has not been deemed rabies-free, as that is the only circumstance in which the age requirement can be said to "facilitate" the reliability of the visual inspection.

## II.    The Six-Month Age Requirement Is Arbitrary and Capricious as Applied to Dogs Arriving From Rabies-Free Caribbean Islands.

Even if the six-month age requirement as applied to dogs arriving from countries the CDC has deemed rabies-free, is within the agency's § 264(a) authority (which it is not), it is still arbitrary and capricious as applied to such dogs.

### A.    The CDC Failed to Appropriately Consider the Reliance Interests on Its Prior Regulations.

The CDC's May 13, 2024 rulemaking undoubtedly represents a substantial regulatory change with respect to dogs arriving to the United States from countries the CDC has deemed to be rabies-free.  Because of the new six-month age requirement, healthy puppies that Appellants otherwise could have placed with adoptive families living in the United States are now prohibited from entering the United States until they are materially older.  This change has been devastating to Appellants' rescue efforts.

Agencies are, of course, "free to change their existing policies," but they must "provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  "[T]he agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new

26

policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "[W]hen an agency rescinds a prior policy, its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy]." *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 51). Moreover, "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino*, 579 U.S. at 221-222 (quoting *Fox*, 556 U.S. at 515). An agency's decision is arbitrary and capricious when it "'ignore[s] such matters.'" *Regents*, 591 U.S. at 30 (quoting *Encino*, 579 U.S. at 215); *id.* at 33 ("[B]ecause DHS was 'not writing on a blank slate,' it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.").

In its rulemaking statement, the CDC did not display any awareness, let alone sensitivity to the fact, that suddenly applying a six-month age requirement even to dogs from rabies-free countries poses an existential threat to the organizational missions of dog rescue organizations (like Appellants) that focus their efforts on those countries and built their organizations in reliance on the CDC regulations that had been in place for decades. That alone arguably renders the new age requirement arbitrary and capricious. *See, e.g.*, *State v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st

27

Cir. 2025) (holding a Department of Education final agency action was likely arbitrary and capricious because, among other things, it did "not appear that the Department properly considered the reliance interests of grant recipients and program participants or that it accounted for all relevant impacts of cutting off funding to programs already in place"). The CDC also did not explain why a more narrowly tailored set of import restrictions would be more appropriate in light of those reliance interests.

## B.    The Age Requirement as Applied to Dogs from Rabies-Free Caribbean Islands Lacks a Rational Connection to the Evidence.

An "agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example, if the agency . . . offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries*, 127 F.3d at 109. The agency must also articulate "a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck*, 371 U.S. at 168). The agency cannot satisfy that requirement by inventing or hypothesizing a problem that does not exist. As then-Judge Kavanaugh wrote for the panel in *National Fuel Gas Supply Corp. v. FERC*, "Professing that an [agency action] ameliorates a real [ ] problem but then citing no evidence demonstrating that there is in fact a[ ] problem is not reasoned decisionmaking." 468 F.3d 831, 843-844 (D.C. Cir. 2006); *see also District of Columbia v. U.S. Dep't of*

28

*Agric.*, 444 F. Supp. 3d 1, 31 (D.D.C. 2020) (holding that an agency is not permitted to enact "a solution in search of a problem").

The facts on which the CDC sought to justify the six-month age requirement do not come close to providing a rational basis for the agency's sweeping action. Section 264(a)'s "necessity standard constrains the [CDC's] granted authority in a material and substantial way." *Ala. Ass'n of Realtors v. U.S. HHS*, 2021 U.S. App. LEXIS 16630, at *4 (D.C. Cir. 2021). The statute does not provide the CDC "authority to impose nationwide any measure . . . to reduce to 'zero' the risk of transmission of a disease—all based only on the director's discretionary finding of 'necessity.'" *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1280 (M.D. Fla. 2021). For a finding of necessity to be sufficiently rational to survive Administrative Procedure Act review, the risk of disease must be real, not merely theoretical. Moreover, the regulation must be tailored to logically reduce or prevent that risk.

The CDC's rulemaking fails those requirements. In its rulemaking, the CDC stated in conclusory fashion that the six-month age requirement is necessary "to prevent the reintroduction and spread of [canine rabies] into the United States." 89 Fed. Reg. 41726, 41726 (May 13, 2024), App. 27. This sort of conclusory statement is not adequate to satisfy the Administrative Procedure Act's requirements. An agency's statements "must be one of 'reasoning'' it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation for its action." *Butte City v. Hogen*, 613

29

F. 3d 190, 194 (D.C. Cir. 2010) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)).    Here, the CDC's own evidence demonstrates that the indiscriminate age requirement, which serves as a prophylactic entry ban on all dogs under six months regardless of provenance, is far broader than necessary.    As the CDC admitted in its May 13, 2024 rulemaking statement, the agency "has not observed *any* [rabies] infections . . . among dogs imported from [rabies]-free or low-risk countries."[8]  89 Fed. Reg. 41726, 41805 (May 13, 2024) (emphasis added), App. 105.    The CDC estimates that nearly 900,000 dogs per year arrive to the United States from rabies-free or low-risk countries.  *See, e.g.*, *id.* at 41754.  Thus, the lack of *any* documented instance of a rabies-infected dog entering the United States from a rabies-free or rabies low-risk country is conclusive that the CDC's new age requirement is irrationally overbroad—exactly the type of "solution in search of a problem" that the Administrative Procedure Act does not permit.[9]

---

[8] The CDC also re-affirmed that it "has confidence in [rabies]-free countries that have declared themselves to be free of canine rabies using [the World Organization for Animal Health's] self-declared validation process" or "which demonstrate adequate surveillance capacity and vaccination control measures in accordance with CDC published metrics . . . ."  *Id.* at 41739.

[9] The administrative record does refer to one incident in which a 2-year-old adult dog from Egypt was flown to Toronto, Canada and then subsequently entered the United States via a land border crossing in Michigan.  The dog was later found to be infected with dog rabies. The published details of the incident do not suggest that the dog's Egyptian provenance was misrepresented at the border crossing.  *See* Raybern *et al*, Rabies in a Dog Imported from Egypt – Kansas, 2019, available at

The CDC also asserted in its rulemaking statement that age requirement "seeks to prevent and deter the importation of dogs with falsified or fraudulent rabies vaccine documentation." *Id.* But this is not a logical explanation for the requirement as applied to dogs arriving from the rabies-free Caribbean islands on which Appellants' rescue efforts focus. First, just as with the prior regulations, the CDC still does not require dogs entering the United States from rabies-free countries to be vaccinated against rabies *at all* or to present any rabies vaccination paperwork. Thus, it is incoherent to assert that, as applied to dogs from such rabies-free countries, a six-month age requirement will serve to reduce or deter vaccination-paperwork fraud. Second, although the CDC in its rulemaking statement indicated that there have been instances of attempted provenance fraud at ports of entry (*i.e.*, representing that the dog is from a rabies-free country when, in fact, it is from a rabies high-risk country), the administrative record does not include a shred of evidence that any of those instances involved dogs arriving from the rabies-free Caribbean islands that are the focus of Appellants' work. Thus, even if the CDC has

---

https://www.cdc.gov/mmwr/volumes/69/ wr/mm6938a5.htm (last visited December 11, 2025). Though the CDC's report on the incident suggests there were reliability issues with the dog's Egyptian rabies vaccination paperwork, this bears no rational relationship to dogs with a rabies-free provenance, because (as noted *infra*) such dogs are not subject to rabies vaccination requirements at all. There also is no rational basis for the CDC to assert that a six-month age requirement would have prevented this particular incident. If anything, the incident speaks to the incoherence of the CDC's decision as part of its May 13, 2024 rulemaking to allow the temporary suspension on the importation of dogs from rabies high-risk countries to expire.

31

a rational basis to impose additional import restrictions on dogs arriving to United States from *some* countries, that does not mean it has a rational basis to impose those same restrictions on dogs arriving from *all* countries. Third, although the CDC has now imposed a uniform age requirement on all dogs seeking to enter the United States from foreign countries, there are still significant differences in the requirements that apply to dogs from high-risk countries as compared to dogs from rabies-free countries. Thus, it is not as if the CDC has eliminated the fraud incentives that the agency says motivated the age requirement.

The D.C. Circuit's decision in *National Fuel* is instructive in that regard. That case involved rules that the Federal Energy Regulatory Commission ("FERC") imposed on natural gas pipeline companies to prevent potential anti-competitive conduct. In 1988, FERC enacted rules requiring "pipelines and their marketing affiliates to function independently" and imposing "restrictions on the sharing of information between them." *National Fuel*, 468 F.3d at 833. The rules were based on concerns that pipelines otherwise would favor their own marketing affiliates in an anti-competitive fashion. *Id.* The D.C. Circuit upheld a challenge to the rules, finding that FERC had "sufficiently demonstrated both a theoretical threat of pipelines granting undue preferences to their marketing affiliates *and* substantial record evidence of actual abuse." *Id.* (emphasis added). "In 2004, FERC significantly revised and extended the [rules] so that they would apply to pipelines'

32

relationships not only with marketing affiliates but also with other entities in the industry (such as producers, gatherers, processors, and traders) that are affiliated with pipelines." *Id.*  In support of the expansion of its rules, FERC "again relied on both a claim theoretical threat . . . and record evidence that, according to FERC, indicated that abuse by pipelines and non-marketing affiliates was a real problem in the industry." *Id.* at 833-834.  On judicial review under the Administrative Procedure Act, the D.C. Circuit found FERC's supposed evidence lacking.  Writing for the panel, then-Judge Kavanaugh held that FERC had "provided no evidence of a real problem with respect to pipelines' relationships with non-marketing affiliates.  Indeed, [the agency's written decision] does not include a single example of abuse by non-marketing affiliates.  Nor does the record disclose complaints from competitors of pipelines' non-marketing affiliates.  Rather, FERC relied on either examples of abuse by *marketing* affiliates (already covered by the old Standards) or comments from the rulemaking that merely reiterated a *theoretical* potential for abuse."  *Id.* at 841 (emphasis in original).  That, the D.C. Circuit held, was not enough.

Reliance on far-fetched theoretical threats of rabies-related fraud precisely describes the CDC's rulemaking statement here.  The CDC cited to examples of falsified rabies vaccination paperwork or fraudulent representations about dogs' provenances that were not connected in any way with the rabies-free Caribbean

33

islands that have been the sole focus of Appellants lawsuit, nor can the CDC offer anything other than wild speculation that those islands might present fraud risks at some indeterminate point in the future. This Court should follow the principles in *National Fuel* and hold that (i) the CDC lacked a factual basis for deciding that a six-month age requirement on dogs entering the United States through rabies-free Caribbean islands is a measure "necessary" to prevent the reintroduction of rabies into the United States, and (ii) the CDC's theoretical concerns about fraudulent conduct that has never occurred in the past are insufficient to rationally justify its sweeping regulatory change, at least on an as-applied basis. This would be a different case if the CDC were able to identify some change in circumstances that engender a plausible expectation that the rabies-free Caribbean islands that are the focus of Appellants' lawsuit would, in the absence of this new six-month age requirement, suddenly present a risk of rabies-related fraud or rabies infections. The CDC did not identify any such changed circumstances in its rulemaking statement, because no such circumstances exist.

Allowing an agency—whether under the guise of public health or otherwise—to justify a significant regulatory change based on pure speculation that events that have never occurred in the past will somehow occur in the future would arm agencies with an extraordinarily dangerous weapon. Arbitrary and capricious review would no longer be about whether the agency has identified a rational connection between

its decision and *actual facts*, but rather about whether the agency has been creative enough to survive judicial review.  That is not, and should not be, the law.

## CONCLUSION

Appellants respectfully request that the Court reverse the decision below, with instructions to enter summary judgment in favor of Appellants.

Respectfully submitted,

*/s/ Aaron M. Katz*
Aaron M. Katz (1st Cir. No. 1170921)
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
T: (617) 915-6305
akatz@aaronkatzlaw.com

*Counsel for Plaintiffs-Appellants*

December 11, 2025

**<u>CERTIFICATION OF COMPLIANCE</u>**

I, Aaron M. Katz, counsel of record to Plaintiffs-Appellants, certify that this brief contains less than 13,000 words and is in 14-point Times New Roman font.

*<u>Aaron M. Katz</u>*

**<u>CERTIFICATION OF SERVICE</u>**

I, Aaron M. Katz, counsel of record to Plaintiffs-Appellants, certify that I served Plaintiffs-Appellants' Opening Brief and the Record Appendix on lead counsel for the Defendants-Appellees, Brian J. Springer, via email.

*<u>Aaron M. Katz</u>*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| ) | |
| ) | |
| BRUNO PROJECT RESCUE INC., ) | |
| *et al.*, ) | |
| ) | |
| **Plaintiffs** ) | |
| ) | |
| v. ) | |
| ) | **Case No. 24-cv-11552-DJC** |
| ) | |
| DEPARTMENT OF HEALTH AND HUMAN ) | |
| SERVICES, *et al.*, ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |
| ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                             **June 18, 2025**

**I.       Introduction**

Plaintiffs Bruno Project Rescue, Inc. ("Bruno Project"), Annie's Faith Foundation ("Annie's"), Caribbean Canine Connection ("Caribbean"), Aruba Flight Volunteers ("Aruba"), Potcake Place K9 Rescue (USA) Inc. ("Potcake Place") and Save the Satos have filed this lawsuit against Defendants Department of Health and Human Services ("DHS"), Centers for Disease Control & Prevention ("CDC") and the Director of the CDC in her official capacity (collectively, "Defendants") seeking declaratory judgment and injunctive relief to resolve a purported violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  D. 1, 7.  Plaintiffs and Defendants have both moved for summary judgment.  D. 34; D. 37.  For the reasons stated below, the Court

1

ADD_000001

DENIES Plaintiffs' motion for summary judgment and ALLOWS Defendants' motion for summary judgment.

## II.     Standard of Review

Summary judgment is ordinarily appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving review of agency action under the APA, however, the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record. See Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015) (observing that "[t]he summary judgment 'rubric' also 'has a special twist in the administrative law context'" (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997))). Rather, when administrative action is challenged under the APA "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Coe v. McHugh, 968 F. Supp. 2d 237, 240 (D.D.C. 2013).

The APA provides that a reviewing court should "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C). "[A] court is not to substitute its judgment for that of the agency." DHS v. Regents of the Univ. of Cal., 591 U.S. 1, 16 (2020) (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)). Instead, it should "assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. (internal citation and quotation marks omitted).

### III.    Factual Background

The following facts are undisputed unless otherwise noted.  Plaintiffs are dog rescue organizations, focused on saving dogs, commonly referred to as "Potcakes," from the Caribbean islands.  D. 35 ¶¶ 1-3.  Over the past decade, Plaintiffs have placed tens of thousands of rescued Potcakes into adoptive homes, the vast majority of which are located within the United States.  Id. ¶ 8.  Plaintiffs generally fly Potcakes to the United States on commercial airlines.  Id. ¶ 9.  Plaintiffs prefer to transport Potcakes as passenger fuselage rather than as cargo.  Id. ¶ 10.  According to Plaintiffs, travel as fuselage is cheaper, safer and less stressful for the dog than travel as cargo.  Id. In addition, Plaintiffs assert that most commercial jets that travel from the Caribbean islands to the United States do not permit dogs to travel as cargo from April to October.  Id.  Although they make an exception for service dogs, commercial airlines do not allow dogs weighing more than twenty pounds to travel as passenger fuselage.  Id. ¶ 11.  Most Potcakes exceed twenty pounds by the time they are six months old.  Id. ¶ 12.

The CDC designates foreign countries as rabies-free, rabies low-risk or rabies high-risk based upon their susceptibility to the dog variant of rabies ("dog rabies").  Id. ¶¶ 13-14.  The CDC currently designates 110 countries as rabies high-risk, four countries as rabies low-risk and 126 countries as rabies-free.  Id. ¶ 17.  The CDC currently designates the Caribbean islands (other than Haiti and the Dominican Republic) as rabies-free.  Id. ¶¶ 18, 19.  The United States Department of Agriculture ("USDA") has approved multiple rabies vaccines for dogs.  Id. ¶¶ 20-29.  The CDC considers a dog to be effectively vaccinated against rabies twenty-eight days after the administration of a USDA-approved rabies vaccine.  Id. ¶ 32.

In 1956, the Department of Health and Human Services ("HHS") enacted regulations to prevent dogs infected with rabies from entering the United States from foreign countries (the "1956

3

ADD_000003

Regulations"). Id. ¶ 33. Under the 1956 regulations, a dog entering the United States from a foreign country needed to appear healthy upon arrival at the port of entry, 42 C.F.R. § 71.51(b)(1) (1956), and either have a "valid rabies vaccination certificate"[1] or be exempt from the vaccination certificate requirement.[2] Id. § 71.51(c)(1); D. 35 ¶ 34. In addition, under the 1956 Regulations, a dog would be denied entry if "during shipment" it "was exposed to a sick or dead animal suspected of having a communicable disease." Id. § 71.51(b)(3)(ii); D. 35 ¶ 35. The 1956 Regulations also permitted the CDC to deny entry to dogs imported from rabies high-risk countries. Id. §§ 71.51, 71.63; D. 35 ¶ 36. The 1956 Regulations did not, however, impose any age requirement for admission of dogs to the United States. D. 35 ¶ 40. Plaintiffs assert that they planned their organizations and funding efforts in reliance upon the 1956 Regulations, and in particular, upon the absence of a minimum age requirement for dogs entering the United States. Id. ¶ 41.

In September 2007, the CDC's rabies expert announced that dog rabies had not been seen in the United States since 2004 and the United States was declared rabies-free. Id. ¶¶ 42-44; D. 30-1 at 2. Since 2007, approximately one million dogs enter the United States from foreign countries annually, and the CDC estimates that approximately 10% of these dogs come from rabies high-risk countries. Id. ¶¶ 45, 47. There have been six known documented instances since 2007 in which a rabies-infected dog has been imported to the United States from a foreign country. Id.

---

[1] A "valid rabies vaccination certificate" is "a certificate which was issued for a dog not less than 3 months of age at the time of vaccination and which: (1) [i]dentifies a dog on the basis of breed, sex, age, color, markings, and other identifying information[;] (2) [s]pecifies a date of rabies vaccination at least 30 days before the date of arrival of the dog at a U.S. port[;] (3) [s]pecifies a date of expiration which is after the date of arrival of the dog at a U.S. port . . .[;] (4) [b]ears the signature of a licensed veterinarian." Id. § 71.51(a).

[2] The 1956 Regulations exempted a dog from the vaccination certification requirement if "the owner submit[ted] evidence satisfactory to the Director that: (i) [i]f a dog is less than 6 months of age, it has been only in a country determined by the Director to be rabies-free . . . or[;] (ii) [i]f a dog is 6 months of age or older, for the 6 months before arrival, it has been only in a country determined by the Director to be rabies-free." Id. § 71.51(c).

4

¶ 48. Each such dog came from a rabies high-risk country, although one was transported to the United States from Egypt (a rabies high-risk country) through Canada (a rabies-free country). Id. Four of the six infected dogs were older than six months. Id.

In May 2019, the CDC announced a temporary suspension of imports of dogs from Egypt. Id. ¶ 55. In June 2021, the CDC extended this temporary suspension to dogs from all rabies high-risk countries. Id. ¶ 56; D. 30-1 at 1-10. The CDC said this change was due to a noticeable increase in the number of dogs arriving with fraudulent rabies vaccination documentation, the limited number of public health resources available to respond to them and the concern that dog rabies could be reintroduced to the United States.[3] D. 30-1 at 1-10. By the time this temporary suspension went into effect, four rabid dogs had been imported into the United States. Id. at 2, 130-31. All four were imported by animal rescue groups for the purpose of adoption and three out of the four cases involved fraud. Id. The CDC extended this suspension multiple times, before allowing it to expire on July 31, 2024. D. 35 ¶¶ 57, 71-72; Control of Communicable Diseases; Foreign Quarantine: Importation of Dogs and Cats, 89 Fed. Reg. 41726, 41738 (Mar. 13, 2024).

As part of this temporary suspension, the CDC began using serologic titer test results (i.e., blood tests) to check whether dogs entering the United States have dog rabies antibodies. D. 30-1 at 59. Dogs entering the United States from rabies high-risk countries must now have vaccination and serology titer test paperwork, which "must also be endorsed by a government official in the exporting country." See Control of Communicable Diseases; Foreign Quarantine: Importation of

---

[3] The CDC continues to consider dog rabies "a serious threat that that requires effective controls to prevent its re-introduction into the United States . . . . The consequences of failure to control [dog rabies] remain extraordinary and significant." D. 30-1 at 129. As the CDC has noted, in 1988 when dog rabies "found in Mexico began spreading in U.S. coyote populations, it spread to wildlife and dogs in Texas where [dog rabies] had been previously eliminated. Two people died and the subsequent re-elimination of [dog rabies] cost $56 million (in 2023 USD) and required over 10 years of effort." Id.

5

Dogs and Cats, 89 Fed. Reg. at 41728.  The CDC implemented this system to reduce the use of fraudulent documentation, reduce the number of dogs denied admission to the United States, reduce the number of sick dogs upon arrival and reduce the need for resources to respond to issues relating to inadequately vaccinated dogs upon arrival.  Id.

In July 2023, the CDC announced a proposed rule for the purpose of "prevent[ing] the reintroduction and spread of [dog rabies] in the United States" and "prevent[ing] and deter[ing] the importation of dogs with falsified or fraudulent rabies vaccine documentation."[4]  Control of Communicable Diseases; Foreign Quarantine:  Importation of Dogs and Cats, 88 Fed. Reg. 43978, 43978 (July 10, 2023).  The rulemaking proposed a requirement that all dogs must be at least six months old to enter the United States, regardless of whether they enter from a rabies-free country.  D. 35 ¶ 61.  The rulemaking, nevertheless, continued the CDC's longstanding practice of allowing dogs entering the United States from a rabies-free country to do so without proof of rabies vaccination, so long as there was adequate documentation that the dog had not been in a rabies high-risk country in the preceding six months.  Id. ¶ 69; Control of Communicable Diseases; Foreign Quarantine:  Importation of Dogs and Cats, 89 Fed. Reg. at 41743.

The CDC cited multiple reasons for this new, proposed rule.  First, inspecting dogs under six months of age for rabies can be difficult because young dogs often exhibit dyskinetic or uncoordinated movement (a characteristic of rabies) as part of their normal development.  D. 30-1 at 141.  These movements subside by the time a dog is six months old, making it easier for an inspector to identify a rabid dog.  Id.  Second, the six-month age requirement makes it easier to determine a dog's age based upon its teeth, id. at 121-22, 40; D. 30-5 at 205, which in turn helps

---

[4] Between January 2020 and July 2021, the CDC documented more than 1,000 instances of incomplete, inadequate or fraudulent rabies vaccination certificates for dogs arriving from rabies high-risk countries.  D. 30-1 at 58.

the CDC confirm that the dog matches the documentation presented and is old enough to have been adequately vaccinated for rabies. D. 30-1 at 121-22, 141. Third, the CDC noted that for dogs requiring a serologic titer test, "the six-month age requirement ensures that the time between titer collection and travel is sufficient for monitoring the dog to ensure it does not develop signs of rabies." Id. at 121.[5] Fourth, the six-month age requirement aligns with current United States Department of Agriculture ("USDA") regulations under the Animal Welfare Act that require dogs imported for resale to be at least six months old. See 9 C.F.R. §§ 2.150-53; D. 30-1 at 141. According to the CDC, the requirement thus removed an incentive to misrepresent the reason why puppies are being imported or to misrepresent the health history of dogs. D. 30-1 at 141.

Some scientific communities, including the World Organization for Animal Health ("WOAH") recommended waiting until a dog is seven months old before importing it into the United States. Id. at 140. The CDC reported that it settled on a six-month age requirement to "provide additional flexibility and less burden to importers without compromising public health goals." Id.

On May 13, 2024, the CDC announced its final rulemaking, which adopted the six-month age requirement for all dogs entering the United States (the "Rule"), codified as 42 C.F.R. § 71.51. D. 35 ¶ 63; Control of Communicable Diseases; Foreign Quarantine: Importation of Dogs and Cats, 89 Fed. Reg. at 41726. Under the Rule, all dogs entering the United States, even those from rabies-free countries, are inspected. D. 30-1 at 114-15. The Agency acknowledged that it had "not observed any [rabies] infections . . . among dogs imported from [rabies]-free or low-risk

---

[5] The CDC also noted that the six-month age requirement aligns with current USDA regulations under the Animal Welfare Act that require dogs imported for resale to be at least six months old, see 9 C.F.R. §§ 2.151(a)(1)(iii), and thus removes any incentive to misrepresent the reason why puppies are being imported, D. 30-1 at 141.

countries." Control of Communicable Diseases; Foreign Quarantine: Importation of Dogs and Cats, 89 Fed. Reg. at 41805.

In its notice of proposed rulemaking, the CDC had considered an exception to the six-month age requirement for individuals seeking to import up to three personal pet dogs per year through a land border crossing into the United States from Mexico or Canada, so long as those dogs had not been in a rabies high-risk country in the previous six months. D. 30-1 at 51. The CDC ultimately decided not to adopt this exception after noting numerous instances during the proposal period in which importers transferred dogs from high-risk countries to Mexico or Canada and then fraudulently represented at the United States border that the dogs had not been in a high-risk country for the previous six months. Id. at 141. According to the CDC, an exception allowing dogs younger than six months to enter the United States via land border crossings would only "create[] a loophole for unscrupulous importers to exploit." Id.

Plaintiffs assert that the Rule has had a "devastating impact" upon their organizations, by (1) "requiring longer and costlier foster periods"; (2) narrowing the window in which they can transport dogs to the United States; (3) reducing adoption opportunities because "many prospective adopters are interested only in adopting puppies that do not meet the CDC's new age requirement"; (4) reducing their donor funds and (5) reducing the number of dogs Plaintiffs have the resources to rescue. D. 35 ¶ 75. In December 2024, the CDC announced that it would revisit the Rule, propose revisions and re-open the rulemaking process, Id. ¶ 77; see Off. of Info. and Regul. Affs., https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202410&RIN=0920-AA87 (last visited June 16, 2025), but, at the recent motion hearing, the parties indicated that there had been no further developments in this regard. In the interim, the CDC continues to enforce the Rule. D. 35 ¶ 78.

IV.    **Procedural History**

Plaintiffs instituted this action on June 13, 2024, D. 1, and shortly thereafter, filed an amended complaint, D. 7.  On July 10, 2024, Plaintiffs moved to stay the effective date of the Rule.  D. 12.  The Court denied the motion, concluding that Plaintiffs had not demonstrated "a likelihood of success on the merits in their challenge to the new CDC regulation or that any irreparable harm that they might suffer with [the Rule] in effect outweighs the public interest implicated by the change in regulations (i.e., namely, preventing a communicable disease, rabies, from being (re)introduced to the United States)."  D. 20.  On November 12, 2024, the government produced the administrative record.  D. 30.  Plaintiffs and Defendants now have filed cross motions for summary judgment.  D. 34; D. 37.

V.    **Discussion**

A.    **The Rule is Promulgated Pursuant to the CDC's Statutory Authority under § 264(a)**

Defendants assert that the CDC has the statutory authority to promulgate the Rule pursuant to 42 U.S.C. § 264(a), D. 38 at 10-13, which provides:

> The [CDC], with the approval of the Secretary [of HHS], is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession.  For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

"[T]he second sentence [of the statute] informs the grant of authority by illustrating the kinds of measures that could be necessary:  inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of contaminated animals and articles."  Ala. Ass'n of Realtors v. HHS, 594 U.S. 758, 763 (2021).  All of "[t]hese measures directly relate to preventing the interstate

9

spread of disease by identifying, isolating, and destroying the disease itself." Id.; see Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev., 992 F.3d 518, 522-23 (6th Cir. 2021) (concluding that § 264(a) permits the enactment of measures akin to "'inspection, fumigation, disinfection, sanitation, pest extermination' and so on").

Defendants assert that "[t]he revised regulation falls squarely within the CDC's regulatory authority because it is an inspection requirement that is directly related to 'identifying, isolating, and destroying [rabies] itself.'" D. 38 at 11 (quoting Ala. Ass'n, 594 U.S. at 763). Plaintiffs insist that the Rule is instead an age-based import ban, because dogs less than six months old are inspected only for age, rather than for rabies, "or even for a rabies proxy."[6] D. 36 at 6, 12-16.

To qualify as an inspection requirement pursuant to 42 U.S.C. § 264(a), a regulation must "directly relate to preventing the interstate spread of disease by identifying, isolating, and destroying the disease itself." Ala. Ass'n, 594 U.S. at 763. Here, the Rule requires that all dogs entering the United States be inspected for rabies, 42 C.F.R. § 71.51(i), and includes the six-month age requirement codified in 42 C.F.R. § 71.51(f) to facilitate such inspection. As the CDC has explained, limiting imports to dogs older than six months makes it easier to (1) identify a rabid dog; (2) determine that the animal matches its documentation and (3) ensure its tests for rabies

---

[6] Import bans are authorized pursuant to 42 U.S.C. § 265, which requires the CDC first make a determination:

> that by reason of the existence of any communicable disease in a foreign country there is a serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interests of the public health.

Because, as discussed more fully below, the Court concludes the Rule was promulgated pursuant to the CDC's statutory authority under 42 U.S.C. § 264(a), the Court does not consider whether the rule was authorized pursuant to 42 U.S.C. § 265(a). See D. 36 at 6, 15; D. 38 at 13 n.13; D. 39 at 3-4.

immunity are accurate.  D. 30-1 at 50, 121-22, 141.  In short, as another court has already

determined, the six-month age requirement is directly related to preventing the spread of rabies.

U.S. Sportsmen's All. Found. v. Centers for Disease Control, No. 24-cv-818, 2025 WL 1068069,

at *6 (W.D. Mich. Feb. 11, 2025) (analyzing 42 U.S.C. § 71.51(a), and noting that it "facilitates

reliable inspections through the six-month age requirement"), report and recommendation adopted,

No. 24-cv-818, 2025 WL 1162418 (W.D. Mich. Apr. 22, 2025).  This means that even if the Rule

cannot be characterized as an inspection requirement, it is, at a minimum, authorized under 42

U.S.C. § 264(a)'s catchall provision for "other measures, as in [the CDC's] judgment may be

necessary."  Id.; cf. Ala. Ass'n, 594 U.S. at 763-64 (concluding that the CDC exceeded its statutory

authority pursuant to 42 U.S.C. § 264(a) by enacting an eviction moratorium in response to the

COVID-19 pandemic).

That the six-month age requirement is in line with other regulations promulgated pursuant

to § 264(a) further underscores this conclusion.  See 21 C.F.R. §1240.62 (banning the commercial

sale of all small turtles); Louisiana v. Mathews, 427 F. Supp. 174, 175-76 (E.D. La. 1977)

(rejecting an argument that the small turtle ban exceeds the FDA's statutory authority pursuant to

42 U.S.C. § 264(a)); Indep. Turtle Farmers of La., Inc. v. United States, 703 F. Supp. 2d 604, 619

(W.D. La. 2010) (concluding that 42 U.S.C. § 264(a) could fairly be read to authorize a ban on the

sale of baby turtles under appropriate factual circumstances).  The Rule is also in step with a prior

version of 42 C.F.R. § 71.51, which imposed an age requirement upon dogs imported from rabies

high-risk countries.  42 C.F.R. § 71.51(a), (c) (1985 version).

**B.     The Rule is Not Arbitrary and Capricious**

Plaintiffs suggest that even if the Rule is authorized by statute, it is arbitrary and capricious

and based upon unreasoned decision-making.  D. 36 at 16-21.  "The scope of review under the

11

'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "One basic procedural requirement of administrative rulemaking is that an agency must give adequate reasons for its decisions." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 212 (2016). "[A]n agency rule would be arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before [it]." Motor Vehicle Mfrs. Ass'n of U.S, 463 U.S. at 43.

Plaintiffs urge that the dog rule is arbitrary and capricious – at least as applied to the Caribbean islands – because "there is absolutely nothing in the administrative [record] that rationally justified the new requirement as a necessary rabies-prevention measure." D. 36 at 16; see Atl. Fish Spotters Ass'n v. Daley, 8 F. Supp. 2d 113, 117 (D. Mass. 1998) (concluding that a regulation banning the use of small spotter planes to harvest tuna was arbitrary and capricious because there was no evidence connecting the use of spotter planes to the rule's justifications and there was data directly refuting same). In making this argument, Plaintiffs liken this case to Sustainable Fisheries Coal. v. Raimondo, 589 F. Supp. 3d 162, 170 (D. Mass. 2022), in which another session of this Court concluded that a Department of Commerce regulation banning the use of midwater trawl gear in certain inshore waters was arbitrary and capricious. D. 36 at 18-19. In reaching this conclusion, the court there noted that although the agency asserted that its finding was supported by an "overlap analysis," the evidence in the administrative record did not show that overlap was "a reliable proxy for localized depletion" and in fact, the government had not produced any scientific evidence that there was "localized depletion," let alone any evidence connecting the use of trawl gear to such depletion. Raimondo, 589 F. Supp. 3d at 170.

Plaintiffs assert that this case is analogous because a dog's age is "not a reliable proxy for whether the dog presents a risk of re-introducing rabies into the United States," particularly because "dogs entering the United States from a rabies-free country are not required to be vaccinated against rabies at the time of entry." D. 36 at 18-19; see D. 39 at 5. But the record here, unlike that in Raimondo, 589 F. Supp. 3d at 170, contains evidence linking a dog's age to the threat it poses with respect to rabies. For example, dogs older than six months are easier to inspect for rabies. D. 30-1 at 141. Plaintiffs also ignore the other evidence in the administrative record supporting the Rule. For example, the CDC noted that the age requirement protects the "welfare of the dog during international travel" while it is subjected to stresses like "long travel times, temperature fluctuations, oxygen or altitude changes, and food/water deprivation." Control of Communicable Diseases; Foreign Quarantine: Importation of Dogs and Cats, 89 Fed. Reg. at 41789.

Plaintiffs insist that "the lack of any documented instances of a rabies- infected dog coming to the United States from a rabies-free or a rabies low-risk country is conclusive that the CDC's new regulation is irrationally overbroad." D. 36 at 19 (emphasis omitted); see D. 39 at 4-7. But the CDC has observed that "[t]he importation of just one dog infected with [rabies] risks re-introduction of the virus into the United States." D. 30-1 at 2. "The importation in 2019 of a single dog with rabies cost more than $400,000 USD for the public health investigations and rabies-port exposure prophylaxis (PEP) of exposed persons." D. 30-1 at 2. And this "does not account for the worst-case outcomes, which include (1) transmission of rabies to a person who dies from the disease or (2) ongoing transmission to other domestic and wildlife specifies in the United States." Id. at 7. In light of this risk, the underlying evidence of vaccination fraud and the incentive that would exist to divert dogs from high-risk countries through low-risk or rabies-free countries if

13

those countries were subject to different age restrictions for dog imports, the CDC's decision to move forward without such specific documentary evidence is not arbitrary and capricious. See Stilwell v. Off. of Thrift Supervision, 569 F.3d 514, 519 (D.C. Cir. 2009) (explaining that "agencies can, of course, adopt prophylactic rules to prevent potential problems before they arise" and "[a]n agency need not suffer the flood before building the levee").

Further, as Plaintiffs conceded at oral argument, an overinclusive regulation is not necessarily arbitrary and capricious. As the Supreme Court has observed, a prophylactic rule may prove "under-inclusive or over-inclusive," in particular cases, but may nonetheless constitute an acceptable "response to legitimate interests." Weinberger v. Salfi, 422 U.S. 749, 776 (1975). In Klamath Forest All. v. U.S. Forest Serv., 746 F. Supp. 3d 761, 769 (N.D. Cal. 2024) the United States District Court for the Northern District of California concluded that the Forest Service's decision to err in favor of being overinclusive with respect to hazard tree abatement was not arbitrary and capricious given "the potential for injury or death to forest visitors" and the impossibility of accurately predicting "whether and when a particular tree will strike a road, trial or facility." Id. (alterations omitted). Here too, the CDC is justified in erring toward over-inclusivity given the substantial risk posed by the introduction of just one rabid dog into the country and the incentive that would exist to divert dogs younger than six-months from rabies high-risk countries through rabies low-risk and rabies free countries in the absence of the Rule.

According to Plaintiffs, the "irrationality" of the CDC's new age requirement is underscored by the CDC's contemporaneous decision to relax the import restrictions it had applied to dogs from high-risk countries. D. 36 at 7. But the relaxation of such restrictions is consistent with the CDC's development of its serologic testing procedures. D. 30-1 at 50, 122. Now that the CDC has a reliable method to confirm the vaccination status of dogs imported from rabies high-

14

risk countries, its decision that a full import ban from those countries was no longer necessary is not irrational.

Plaintiffs assert that "[i]n its rulemaking statement the CDC did not display any awareness, let alone sensitivity, that the new age requirement poses an existential threat to the organizational missions of dog rescue organizations . . . that focus their efforts on rabies-free countries." D. 36 at 17. But the CDC did exactly this by adopting a six-month age requirement rather than the seven-month requirement recommended by WOAH, in an effort to strike a balance with the needs of importers. D. 30-1 at 140. For all these reasons, the Court concludes that the CDC did "provide a reasoned explanation for the change" and declines to find the Rule arbitrary and capricious. Encino Motorcars, LLC, 579 U.S. at 221; see Sportsmen's All. Found, 2025 WL 1162418, at *4-5 (concluding same).

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 37, and DENIES Plaintiffs' motion for summary judgment, D. 34.

**So Ordered.**

/s Denise J. Casper
United States District Judge

15

ADD_000015

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**BRUNO PROJECT RESCUE INC., ET AL**
        Plaintiff(s)

        v.                               CIVIL ACTION NO.**24-11552-DJC**

**CENTERS FOR DISEASE CONTROL &**
**PREVENTION, ET AL**
        Defendant(s)

## JUDGMENT IN A CIVIL CASE

CASPER, D.J.

☐    **Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

X    **Decision by the Court**.  In accordance with the Memorandum and Order dated June 18, 2025, D. 41, granting defendants' motion for summary judgment;

    **IT IS  ORDERED AND ADJUDGED**

    Judgment for the defendants.

                                 Robert M. Farrell, Clerk

Dated:  June 18, 2025                  /s/ Lisa M. Hourihan
                                       ( By )  Deputy Clerk

NOTE:  The post judgment interest rate effective this date is ____%.

(judgciv.frm - 10/96)                                           [jgm.]

**ADD_000016**

# 42 U.S.C. § 264 - U.S. Code - Unannotated Title 42. The Public Health and Welfare § 264. Regulations to control communicable diseases

**(a)Promulgation and enforcement by Surgeon General**

The Surgeon General, with the approval of the Secretary, is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

**(b)Apprehension, detention, or conditional release of individuals**

Regulations prescribed under this section shall not provide for the apprehension, detention, or conditional release of individuals except for the purpose of preventing the introduction, transmission, or spread of such communicable diseases as may be specified from time to time in Executive orders of the President upon the recommendation of the Secretary, in consultation with the Surgeon General, [1].

**(c)Application of regulations to persons entering from foreign countries**

Except as provided in subsection (d), regulations prescribed under this section, insofar as they provide for the apprehension, detention, examination, or conditional release of individuals, shall be applicable only to individuals coming into a State or possession from a foreign country or a possession.

**(d) Apprehension and examination of persons reasonably believed to be infected**

**(1)** Regulations prescribed under this section may provide for the apprehension and examination of any individual reasonably believed to be infected with a communicable disease in a qualifying stage and (A) to be moving or about to move from a State to another State; or (B) to be a probable source of infection to individuals who, while infected with such disease in a qualifying stage, will be moving from a State to another State. Such regulations may provide that if upon examination any such individual is found to be infected, he may be detained for such time and in such manner as may be reasonably necessary. For purposes of this subsection, the term "State" includes, in addition to the several States, only the District of Columbia.

**(2)** For purposes of this subsection, the term "qualifying stage", with respect to a communicable disease, means that such disease--

**(A)** is in a communicable stage; or

**(B)** is in a precommunicable stage, if the disease would be likely to cause a public health emergency if transmitted to other individuals.

**(e) Preemption**

Nothing in this section or section 266 of this title, or the regulations promulgated under such sections, may be construed as superseding any provision under State law (including regulations and including provisions established by political subdivisions of States), except to the extent that such a provision conflicts with an exercise of Federal authority under this section or section 266 of this title.

# 42 U.S.C. § 265 - U.S. Code - Unannotated Title 42. The Public Health and Welfare § 265. Suspension of entries and imports from designated places to prevent spread of communicable diseases

Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

This content is from the eCFR and is authoritative but unofficial.

**Title 42 — Public Health**

**Chapter I — Public Health Service, Department of Health and Human Services**

**Subchapter F — Quarantine, Inspection, Licensing**

**Part 71 — Foreign Quarantine**

**Subpart F — Importations**

> **Authority:** Secs. 215 and 311 of Public Health Service (PHS) Act. as amended (42 U.S.C. 216, 243); secs. 361-369, PHS Act, as amended (42 U.S.C. 264-272).
>
> **Source:** 50 FR 1519, Jan. 11, 1985, unless otherwise noted.

## § 71.51 Dogs and cats.

(a) *Definitions.* As used in this section the term:

*Animal* means, for purposes of this section, any domestic cat (*Felis catus*) or domestic dog (*Canis familiaris*).

*CDC dog import form* means an OMB-approved form submitted to CDC through an online portal that includes the importer's name and contact information; description of the dog, including microchip number and current photographs of the dog's face and body; purpose of importation; travel information, including dates of departure and arrival, country of departure, countries the dog has been physically present in within the last six months, and U.S. port of entry; and other information as described in CDC technical instructions.

*CDC dog import permit* means a document issued by CDC granting approval to import a dog into the United States from a DMRVV-restricted country. To receive a permit, eligible importers submit information to CDC that includes the importer's name and contact information; description of the dog, including microchip number and current photographs of the dog's face and body; purpose of importation; travel information, including dates of departure and arrival, country of departure, countries the dog has been physically present in within the last six months, and U.S. port of entry; and other information as described in CDC technical instructions.

*CDC-registered animal care facility* means a facility registered by CDC for the purpose of providing veterinary care and housing to animals imported into the United States.

*Certification of dog arriving from DMRVV-free or DMRVV low-risk country* means the OMB-approved form that together with other records may be used by an importer to demonstrate that a dog has been only in DMRVV-free or DMRVV low-risk countries during the six months before the dog's arrival in the United States.

*Certification of foreign rabies vaccination and microchip* means the Office of Management and Budget (OMB)-approved form that must be:

(i) completed by an authorized veterinarian, which may include an official government veterinarian, in the exporting country; and

(ii) reviewed and signed by an official government veterinarian in the exporting country attesting that the information listed is true and correct.

*Certification of U.S.-issued rabies vaccination* means the OMB-approved form that must be completed by a U.S. Department of Agriculture (USDA)-Accredited Veterinarian and endorsed by a USDA Official Veterinarian prior to a dog's departure from the United States in order to demonstrate compliance with admissibility requirements upon the dog's return to the United States from a DMRVV high-risk country.

*Conditional release,* when applied to an animal, means the temporary release of an animal from the custody of a carrier or a CDC-registered animal care facility into the care of a licensed veterinarian approved by the Director, for the purpose of receiving emergency medical care or a public health evaluation, pending an admissibility determination or removal of the animal from the United States. The licensed veterinarian must return conditionally released animals immediately to the custody of the carrier or the CDC-registered animal care facility upon the conclusion of such medical care or evaluation.

*Confinement,* when applied to an animal, means restriction to a building or other enclosure at a U.S. port or other location approved by the Director, including *en route* to a destination, separate from other animals, and from persons except for contact necessary for its care. If the animal is allowed out of the enclosure, it must be muzzled and kept on a leash.

*DMRVV* means dog-maintained rabies virus variant and includes any rabies virus variant that is known or suspected to have an enzootic transmission cycle in which dogs are essential for the maintenance of the viral variant. This includes epidemiologic situations in which dogs are the only recognized reservoir species, as well as situations in which dogs and other species (typically wildlife) both play epidemiologically relevant roles in maintaining enzootic transmission.

*DMRVV-free country* means a country determined by the Director as not having DMRVV present based on internationally accepted standards.

*DMRVV high-risk country* means a country determined by the Director as having high risk for DMRVV transmission based on factors such as the presence and geographic distribution of the virus, or low quality of or low confidence in rabies surveillance systems or dog vaccination programs. A list of the DMRVV high-risk countries is available on CDC's website.

*DMRVV low-risk country* means a country determined by the Director as having low risk for DMRVV transmission based on factors such as the virus being limited to a localized area, adequacy of surveillance and dog vaccination programs to prevent further geographic distribution of the virus, and the virus being in a controlled status with the country's heading toward eventual DMRVV-free status.

*DMRVV-restricted country* means a country from which the import of dogs into the United States has been prohibited or otherwise restricted. Designation of a DMRVV-restricted country may be based on the country's export of dogs infected with DMRVV to any other country within a timeframe determined by the Director or based on the country's lacking adequate controls, as determined by the Director, to monitor and prevent the export of dogs to the United States with falsified or fraudulent rabies vaccination credentials, inaccurate or invalid rabies vaccination documentation, or other fraudulent, inaccurate, or invalid importation documents.

*Flight parent* means any person transporting one or more animals on behalf of an importer for purposes of resale, adoption, or transfer of ownership. A flight parent is typically solicited through social media and may be compensated (including through goods and services, *e.g.,* complimentary airplane ticket, paid baggage fees, other paid fees) or be uncompensated. If required by USDA, flight parents must possess all required Federal licenses or registrations to transport animals.

*Importer* for purposes of this section means any person importing or attempting to import an animal into the United States, including an owner or a person acting on behalf of an importer, such as a broker registered with U.S. Customs and Border Protection (CBP) or a flight parent. If required by USDA, an individual transporting an animal on behalf of an importer, including a flight parent must possess all required Federal licenses or registrations to transport animals.

*Owner* means owner or agent.

*SAFE TraQ* means CDC's System for Animal Facility Electronic Tracking of Quarantine or other system as approved by the Director for tracking pre-clearance management (*e.g.,* quarantine, medical examinations, vaccinations, diagnostic testing, screening, and travel information) of animals arriving in the United States through a CDC-registered animal care facility.

*Serologic Testing,* when applied to an imported animal, means a rabies antibody titration test performed by a CDC-approved rabies laboratory using a CDC-approved technique. The serology sample must be drawn, submitted, and tested in accordance with CDC technical instructions. The current list of CDC-approved laboratories is available online on CDC's website. CDC will update its website as needed.

*USDA-Accredited Veterinarian* shall have the same definition as *Accredited Veterinarian* under 9 CFR 160.1.

*USDA Official Veterinarian* means the Animal and Plant Health Inspection Service (APHIS) veterinarian who is assigned by the USDA Administrator to supervise and perform the official work of APHIS in any U.S. State or several U.S. States.

(b)  *Authorized U.S. airports for dogs and cats.*

(1)  Cats may arrive at and be admitted into the United States through any U.S. airport.

(2)  Dogs arriving to the United States from DMRVV low-risk or DMRVV-free countries and with documentation confirming that they have been only in DMRVV low-risk or DMRVV-free countries during the last six months may arrive at and be admitted into the United States through any U.S. airport.

(3)  Dogs that have a valid certification of U.S.-Issued rabies vaccination form may arrive at and be admitted into the United States through any U.S. airport.

(4)  Dogs that have been in a DMRVV high-risk country within the last six months and have a valid certification of foreign rabies vaccination and microchip form must arrive at and may be admitted only through a U.S. airport with a CDC quarantine station (also known as a U.S. port health station) and a CDC-registered animal care facility.

(5)  Dogs that have been in a DMRVV high-risk country within the last six months that arrive at an unauthorized U.S. airport or that arrive without a valid certification of U.S.-issued rabies vaccination or certification of foreign rabies vaccination and microchip form shall be denied admission and returned to their countries of departure via air pursuant to paragraph (v) of this section.

(6)  The current list of U.S. airports with CDC-registered animal care facilities is available on CDC's website. CDC will update the list as needed.

(c)  *Authorized U.S. land ports for dogs and cats.*

(1)  Cats may arrive at and be admitted into the United States through any U.S. land port.

ADD_000022

(2) Dogs arriving to the United States from DMRVV low-risk or DMRVV-free countries and with documentation confirming that they have been only in DMRVV-free or DMRVV low-risk countries during the last six months may arrive at and be admitted into the United States through any U.S. land port.

(3) Dogs that have a valid certification of U.S.-issued rabies vaccination form may arrive at and be admitted into the United States through any U.S. land port.

(4) Dogs that have been in a DMRVV high-risk country within the last six months and do not have a valid certification of U.S.-issued rabies vaccination form are not authorized to enter the United States through any U.S. land port and shall be denied admission into the United States.

(d) *Authorized U.S. seaports for dogs and cats.*

(1) Cats may arrive at and be admitted into the United States through any U.S. seaport.

(2) Dogs arriving to the United States from DMRVV low-risk or DMRVV-free countries and with documentation confirming that they have been only in DMRVV-free or DMRVV low-risk countries during the last six months may arrive at and be admitted into the United States through any U.S. seaport.

(3) Dogs that have a valid certification of U.S.-issued rabies vaccination form may arrive at and be admitted into the United States through any U.S. seaport.

(4) Dogs that have been in a DMRVV high-risk country within the last six months and do not have a valid certification of U.S.-issued rabies vaccination form are not authorized to enter the United States through any U.S. seaport and shall be denied admission into the United States.

(5) Notwithstanding paragraph (d)(4) of this section, a dog meeting the definition of a "service animal" under 14 CFR 382.3 that has been in a DMRVV high-risk country within the last six months and was vaccinated against rabies in a foreign country may be admitted through a U.S. seaport if:

(i) The dog accompanies an "individual with a disability" as defined under 14 CFR 382.3; and

(ii) The dog has a valid and complete certification of foreign rabies vaccination and microchip form and a valid serologic titer from a CDC-approved laboratory.

(e) *Limitation on U.S. ports for dogs and cats.*

(1) The Director may limit the times, U.S. ports, or conditions under which dogs or cats may arrive at and be admitted to the United States based on an importer's, CDC-registered animal care facility's, or carrier's failure to comply with the provisions of this section or as needed to protect the public's health. If the Director determines a limitation is required, the Director will notify importers, CDC-registered animal care facilities, and carriers in writing of the specific times, U.S. ports, or conditions under which dogs and cats may be permitted to arrive at and be admitted to the United States.

(2) CBP will prescribe the time, place, and manner in which dogs are presented upon arrival at a port of entry, which may include prohibiting dogs from being presented within the Federal Inspection Station.

(f) *Age requirement for all dogs.*

(1) All dogs presented for admission into the United States must be at least six (6) months old at the time of their arrival into the United States.

ADD_000023

(2) Dogs arriving into the United States that are not at least six (6) months old at the time of their arrival shall be denied admission and returned to the country of departure pursuant to paragraph (v) of this section.

(g) *Microchip requirements for all dogs.*

(1) All dogs presented for admission into the United States must have a microchip implanted prior to arrival at the U.S. port.

(2) The microchip must have been implanted on or before the date the current rabies vaccine was administered. Rabies vaccines administered prior to the implantation of a microchip are invalid.

(3) The microchip number must be documented on the certification of foreign rabies vaccination and microchip form, the certification of U.S.-issued rabies vaccination form, or if the dog is arriving from a DMRVV low-risk or DMRVV-free country, documented on one of the forms listed in paragraph (u)(2) of this section and all accompanying veterinary records. The microchip number must also be documented on the CDC dog import form.

(4) Importers must consent to the scanning of the dogs' microchip by CDC quarantine public health officers, CDC-registered animal care facility staff, or their representatives, upon the dogs' arrival at a U.S. port.

(5) Dogs arriving in the United States without a microchip, with a microchip that cannot be detected, with a microchip that does not match the accompanying documentation, or if the importer refuses to have the dogs' microchip scanned, shall be denied admission and returned to the country of departure pursuant to paragraph (v) of this section.

(h) *CDC dog import form for all dogs.*

(1) All importers of dogs must submit a complete and accurate CDC dog import form to CDC via a CDC-approved system prior to the dogs arriving in the United States. This includes accompanied or unaccompanied dogs arriving by air, land, or sea regardless of where the dogs originated or whether arriving as cargo, checked-baggage, or hand-carried baggage. This excludes dogs that are transiting through the United States without making an entry in accordance with paragraph (cc) of this section.

(2) Dogs that arrive without a receipt confirming that the CDC dog import form was submitted before the dogs' arrival in the United States may be denied admission and returned to their country of departure pursuant to paragraph (v) of this section, regardless of the value of the shipment.

(3) Dogs arriving by air without a receipt confirming that the CDC dog import form was submitted before the dogs' arrival in the United States may be held in the care of a CDC-registered animal care facility, on a space-available basis, for up to 24 hours after their arrival. If the dogs arrive at an airport without a CDC-registered animal care facility or if the animal care facility lacks space to house the dogs, the dogs may be held in the care of a licensed veterinarian approved by CDC for up to 24 hours after their arrival until the *CDC Dog Import Form* is filed. The importer (or airline if the importer abandons the animal) is responsible for making all necessary arrangements with a CDC-registered animal care facility or a veterinary clinic (if the CDC-registered animal care facility is unavailable at the airport or lacks space to house the dogs), including arranging transportation to the facility. The airline may require reimbursement from an importer for any associated costs incurred by the airline on the importer's behalf.

ADD_000024

(4) Dogs arriving by sea without a receipt confirming submission of a CDC dog import form may be held on board the vessel until the form is filed. The vessel's owner or operator may require reimbursement from an importer for any associated costs incurred by the vessel's owner or operator on the importer's behalf.

(5) Dogs arriving by land without a receipt confirming submission of a CDC dog import form shall be denied admission and returned immediately to the dogs' country of departure, but such denial does not prevent the importer from reapplying for admission of the dogs after the form is filed.

(6) A receipt confirming submission of the CDC dog import form must accompany all dogs departing foreign locations for travel to the United States. For dogs departing from foreign airports to the United States, the airline must deny boarding to dogs unless the importer has presented this receipt prior to boarding.

(7) Airlines, unless granted a waiver in accordance with paragraph (dd) of this section, are required to create a bill of lading for all dogs arriving in the United States prior to the dogs' arrival. This includes dogs transported as cargo, checked-baggage, or hand-carried baggage. If granted a waiver to the bill of lading requirement, the airline's handling and transport of the dogs must be consistent with the terms of that waiver.

(8) Unless being transported by an airline for which a waiver to the bill of lading requirement has been granted pursuant to paragraph (dd) of this section, dogs arriving by air for which a bill of lading has not been filed prior to their arrival in the United States (or if the airline's handling and transport of the dogs is inconsistent with the terms of the waiver) shall be denied admission and returned to their country of departure pursuant to paragraph (v) of this section.

(i) *Inspection requirements for admission of all dogs and cats.*

(1) All animals arriving at a U.S. port shall be inspected upon arrival, and only those animals that show no signs of communicable disease as defined in 42 CFR 71.1 shall be admitted into the United States.

(2) All animals presented for admission into the United States may be subject to additional examination and disease surveillance screening for the purpose of communicable disease surveillance. Ill animals may be required to undergo additional diagnostic testing prior to release of the animal; such testing is not considered surveillance screening.

(3) The Director may require confinement of an animal and examination by a veterinarian when necessary to determine whether the animal is admissible into the United States, for instance, if dental examination would assist in determining the animal's age.

(4) Importers who refuse to consent to inspection, examination, disease surveillance screening, or diagnostic testing of the animal upon arrival shall have the animal denied admission and returned to its country of departure pursuant to paragraph (v) of this section.

(j) *Examination by a USDA-accredited veterinarian and confinement of exposed dogs and cats or those that appear unhealthy.*

(1) If an animal, upon inspection, does not appear to be in good health (*e.g.,* it has signs such as emaciation, lesions of the skin, discharge of the eyes or nose, coughing, sneezing, nervous system disturbances, inability to stand or walk, difficulty breathing, jaundice, vomiting, or diarrhea), or

ADD_000025

appears healthy but, during shipment, may have been exposed to a sick or dead animal (including an animal other than a dog or cat) suspected of having a communicable disease, the Director may require prompt confinement and veterinary examination.

(2) In the case of animals that appear unhealthy or those that were potentially exposed and arriving by air or sea, the Director may require the airline or vessel's master or operator to arrange for a licensed veterinarian to examine the animal and give or arrange for any tests or treatment indicated. In the case of animals that appear unhealthy or those that were potentially exposed and arriving by land, the Director may deny admission, but such denial does not prevent the importer from reapplying for admission after providing the Director with satisfactory evidence that a licensed veterinarian has examined the animal and administered any tests or treatment as needed to ensure the animal does not have a communicable disease.

(3) Carriers shall maintain a record of sickness of animals occurring while *en route* to the United States and shall submit the record to the CDC quarantine station with jurisdiction for the U.S. port.

(4) Animals that become sick while *en route* or on arrival shall be separated from other animals (including animals other than dogs or cats) as soon as the sickness is discovered and shall be held in confinement pending any necessary examination as determined by the Director.

(5) Airlines (in the case of arrivals by air) or the masters or operators of vessels (in the case of arrivals by sea) shall immediately arrange for confinement and medical evaluation of any ill or injured animals at a CDC-registered animal care facility or CDC-approved veterinary facility (if a CDC-registered animal care facility is not available) which, in the judgment of the Director, affords protection against transmission of any communicable disease, and suitable housing in accordance with the Animal Welfare Act (7 U.S.C. 2131 *et seq.,* as may be amended). In the case of ill or injured animals arriving by land, the Director may deny admission, but such denial does not prevent the importer from reapplying for admission after providing the Director with satisfactory evidence of confinement (as needed) and examination by a licensed veterinarian.

(6) The airline or vessel's master or operator shall immediately thereafter arrange for transportation of any ill or injured animals by a CBP-bonded transporter to the CDC-registered animal care facility or other CDC-approved veterinary facility (if a CDC-registered animal care facility is not available) for confinement and medical evaluation. The airline or vessel's master or operator shall arrange to have ill or injured animals transported in a way that does not expose transportation personnel or the public to communicable diseases.

(7) The Director will consider the findings of the examination and tests in determining whether the animal may have a communicable disease.

(8) The importer shall bear the expenses of transportation, confinement, examination, tests, and treatment under this paragraph. If an importer fails to arrange for or pay for such expenses or cooperate with any CDC-mandated public health evaluations, then the animal will be considered abandoned, and the carrier shall assume financial responsibility pursuant to paragraph (aa) of this section.

(9) Confinement shall be subject to conditions specified by the Director to protect the public's health.

(10) CDC may request that CBP conditionally release animals for medical evaluation and treatment in emergency or exigent circumstances. Animals eligible for conditional release shall remain under the legal custody of the carrier or CDC-registered animal care facility for the purpose of receiving veterinary medical care. If such animals are conditionally released to a CDC-approved veterinary

ADD_000026

facility (if a CDC-registered animal care facility is not available or cannot provide the level of care needed), then the animal must be immediately returned to the custody of the carrier or CDC-registered animal care facility once medical treatment is no longer required or upon request by either CDC or CBP.

(11) If an importer (or carrier if the animal is abandoned by the importer) opts to have an animal euthanatized (*e.g.,* under circumstances where the animal is fatally ill or injured), the importer or carrier shall promptly communicate this decision to CDC in writing and prior to euthanasia. Euthanasia does not relieve importers or carriers of the obligation to arrange and pay for testing and necropsy required by CDC.

(k) *Veterinary examination, revaccination against rabies, and quarantine at a CDC-registered animal care facility for foreign-vaccinated dogs from DMRVV high-risk countries.*

(1) All dogs arriving into the United States that have been in DMRVV high-risk countries within the last six months and that do not have a valid certification of U.S.-issued rabies vaccination form shall undergo veterinary examination and revaccination against rabies at a CDC-registered animal care facility upon arrival.

(2) The importer is responsible for making all arrangements relating to the examination, revaccination, and quarantine (if applicable) at a CDC-registered animal care facility prior to the dog's arrival in the United States. The costs of examination, vaccination, and quarantine (if applicable) shall be borne by the importer and not at the government's expense.

(3) Prior to granting a reservation, CDC-registered animal care facilities must ensure they have received the following:

(i) The completed certification of foreign rabies vaccination and microchip form;

(ii) Serologic test results (if applicable) obtained from a CDC-approved laboratory on a blood sample drawn, submitted, and tested in accordance with CDC's technical instructions;

(iii) Photos of the dogs' teeth to assist with age verification;

(iv) The travel itinerary for the dogs confirming that the dogs will be arriving only at a U.S. airport with a CDC-registered animal care facility and will not be arriving at any other U.S. port; and

(v) A receipt confirming submission of the CDC dog import form.

(4) Importers must present documentation to airlines confirming their reservation at a CDC-registered animal care facility prior to their dogs boarding a flight to the United States. Airlines must deny boarding to dogs if the importer fails to present such documentation.

(5) Airlines must deny boarding to any foreign-vaccinated dog that has been in a DMRVV high-risk country within the last six months for which the importer has not presented a receipt confirming submission of the CDC dog import form and proof of a reservation at a CDC-registered animal care facility, or that is being presented for travel to an unauthorized U.S. airport.

(6) The airline shall arrange for dogs to be transported by a CBP-bonded transporter to the CDC-registered animal care facility immediately upon arrival at the U.S. airport.

(7) The dogs shall remain in the custody of the CDC-registered animal care facility until the following requirements are met:

ADD_000027

**42 CFR 71.51 (up to date as of 12/04/2025)**
Dogs and cats.

42 CFR 71.51(k)(7)(i)

    (i) Veterinary health examination by a USDA-accredited veterinarian for signs of illness. All illnesses must be documented in SAFE TraQ. CDC will review these illness case reports and determine admissibility prior to the dog's release. Suspected or confirmed communicable diseases, including the presence of ectoparasites (*i.e.,* ticks and fleas), must be reported to CDC prior to release of the dog;

    (ii) Confirmation of microchip number;

    (iii) Confirmation of age through dental examination by a USDA-accredited veterinarian;

    (iv) Vaccination against rabies with a USDA-licensed rabies vaccine that is administered by a USDA-accredited veterinarian; and

    (v) Confirmation of adequate rabies serologic titer from a CDC-approved laboratory. Blood samples for serologic tests must be drawn within a timeframe as specified in CDC technical instructions. Dogs that arrive without an adequate rabies serologic test results from a CDC-approved laboratory, or with a serologic test result drawn outside the acceptable timeframe, or with serologic test results outside acceptable parameters, shall be housed at the CDC-registered animal care facility for a 28-day quarantine period following administration of the USDA-licensed rabies vaccine.

(l) *Registration or renewal of CDC-registered animal care facilities.*

    (1) A facility must register with and receive written approval from the Director to function as a CDC-registered animal care facility before housing any live dog imported into the United States. Applications and all required documents must be submitted to *cdcanimalimports@cdc.gov*.

    (2) The CDC-registered animal care facility must be located within 35 miles of a CDC quarantine station.

    (3) To register or renew a registration certificate, a facility must submit the following documents to CDC:

        (i) A completed registration/application form;

        (ii) A statement of intent that describes the number and types of animals the facility can safely house at any one time, including the number of animals that can be housed in the quarantine area;

        (iii) Written standard operating procedures that include all elements required in paragraphs (k) through (q) of this section;

        (iv) A copy of all required Federal, State, or local registrations, licenses, and/or permits; a facility must have a USDA Class H intermediate handlers registration (and any additional class licenses or registrations as deemed appropriate by USDA) and a CBP Facilities Information and Resource Management System (FIRMS) code; and

        (v) A self-certification signed by the owner or manager of the CDC-registered animal care facility stating that the facility is in compliance and agrees to continue to comply with the regulations in this section.

    (3) Upon receiving the documentation required by this section, the Director will review the application and either grant or deny the application for registration as a CDC-registered animal care facility. Applications that are denied may be appealed under paragraph (r) of this section.

ADD_000028

(i)    Before issuing a registration, the Director may inspect any animal health record, facility, vehicle, or equipment to be used in management, examination, and clearance of imported animals. Thereafter, animal health records, facilities, vehicles, and equipment used in importing animals may be inspected during annual site inspection visits or when otherwise needed to protect the public's health.

(ii)    CDC may conduct unannounced inspections of facilities seeking to register or renew their status as a CDC-registered animal care facility or when otherwise needed to protect the public's health.

(iii)    CDC inspections will be based on USDA Animal Welfare regulation standards (9 CFR parts 1, 2, and 3) and other standards as outlined in CDC's *Technical Instructions for CDC-registered Animal Care Facilities*.

(iv)    Unless revoked in accordance with paragraph (r) of this section, a registration certificate issued under this section is effective for two years beginning from the date CDC issues the registration certificate.

(v)    A CDC-registered animal care facility must apply to CDC for renewal of the registration certificate not less than 60 days and not more than 90 days before the existing registration expires.

(4)    The Director may deny an application to register, renew, or reinstate a facility as a CDC-registered animal care facility if the registrant has had a previous registration revoked in accordance with paragraph (r) within the last five years.

(5)    All CDC-registered animal care facilities must comply with the requirements of paragraphs (k) through (q) of this section.

(m)    *Record-keeping requirements at CDC-registered animal care facilities.*

(1)    A CDC-registered animal care facility must retain records regarding each imported animal for three years after the release or return of the animal. Each record must include:

(i)    the bill of lading (or other alternative documentation if the airline has been granted a waiver under paragraph (dd) of this section) for the shipment;

(ii)    the name, address, phone number, and email address of the importer and owner (if different from the importer);

(iii)    the number of animals in the shipment;

(iv)    the identity of each animal in each shipment, including name, microchip number, date of birth, sex, breed, and coloring;

(v)    the airline, flight number, date of arrival, and port of arrival of the shipment; and

(vi)    veterinary medical records for the animal, including:

(A)    Certification of foreign rabies vaccination and microchip form and rabies serology obtained before arrival in the United States (if applicable);

(B)    the USDA-licensed rabies vaccine administered upon arrival;

(C)    veterinary examination records upon arrival and while in quarantine;

ADD_000029

        (D)  rabies serology performed while in quarantine in the United States (if applicable);

        (E)  all diagnostic test results performed during quarantine; and

        (F)  necropsy reports for imported animals that die while in the care of the CDC-registered animal care facility.

    (2)  A CDC-registered animal care facility must maintain records electronically in SAFE TraQ.

      (i)  Copies of all records must be entered directly into or uploaded into SAFE TraQ;

      (ii)  Records must be uploaded and complete prior to the animal's release from the facility (or for necropsy results within 30 days of an animal's death); and

      (iii)  CDC will audit records remotely as needed and in-person during site inspection visit(s) at the facility.

(n)  *Worker protection plan and personal protective equipment (PPE).*

    (1)  A CDC-registered animal care facility must establish and maintain a worker protection plan with standards comparable to those in the Occupational Safety and Health Administration's *Recommended Practices for Safety and Health Programs* and the National Association of Public Health Veterinarians (NASPHV) *Compendium of Veterinary Standard Precautions for Zoonotic Disease Prevention in Veterinary Personnel.*

    (2)  In addition to complying with the requirements of this section, a facility must comply with all relevant Federal and State requirements relating to occupational health and safety.

    (3)  Rabies pre-exposure prophylaxis is required for workers who handle imported animals with signs of illness or in quarantine, and for staff who perform necropsies of imported animals. Rabies pre-exposure prophylaxis must be administered in accordance with the Advisory Committee on Immunization Practices guidelines for pre-exposure prophylaxis vaccination to prevent human rabies.

    (4)  Post-exposure procedures that provide potentially exposed workers with direct and rapid access to a medical consultant are required.

    (5)  Procedures for documenting the frequency of worker training, including for those working in the quarantine area, are required.

    (6)  As part of the worker protection plan, a facility must establish, implement, and maintain hazard evaluation and worker communication procedures that include the following:

      (i)  Descriptions of known communicable disease and injury hazards associated with handling animals;

      (ii)  The need for PPE when handling animals and training in the proper use of PPE, including re-training and reinforcement of appropriate use;

      (iii)  Procedures for disinfection or safe disposal of garments, supplies, equipment, and waste; and

      (iv)  Procedures for reporting to CDC within 48 hours suspected or confirmed communicable diseases in facility workers associated with handling imported animals.

(o)  *CDC-registered animal care facility standard operating procedures, requirements, and equipment standards for crating, caging, and transporting live animals.*

ADD_000030

(1)  Equipment standards for crating, caging, and transporting live animals must be in accordance with USDA Animal Welfare regulation standards (9 CFR parts 1, 2, and 3) and International Air Transport Association standards.

(2)  Animals must not be removed from crates during transport.

(3)  Used PPE, bedding, and other potentially contaminated material must be removed from the ground transport vehicle upon arrival at the animal care facility and disinfected in a manner that would destroy potential pathogens of concern or safely disposed of in a manner that prevents the spread of communicable disease.

(p)  *Health reporting and veterinary service requirements for animals at CDC-registered animal fare facilities.*

(1)  A CDC-registered animal care facility must provide the following services for each animal upon arrival and ensure that each animal meets CDC entry requirements prior to release from the facility:

(i)  veterinary examination by a USDA-accredited veterinarian within one business day of arrival;

(ii)  verification of microchip and confirmation that the microchip number matches the animal's health records;

(iii)  verification of an animal's age via a dental examination or, if dental examination cannot be reliably performed, verification through another CDC-approved diagnostic method (*e.g.,* ocular lens examination, radiographs);

(iv)  revaccination against rabies using a USDA-licensed vaccine; and

(v)  confirmation of a valid serology test from a CDC-approved laboratory on a sample drawn from a dog prior to arrival within a timeframe and results within parameters as specified in CDC technical instructions, or completion of a 28-day quarantine at the CDC-registered animal care facility after administration of the USDA-licensed rabies vaccine.

(2)  A CDC-registered animal care facility must provide the following services upon the occurrence of any morbidity or mortality in an imported animal in the facility:

(i)  Immediate isolation of the animal and implementation of infection prevention and control measures in accordance with industry standards and CDC technical instructions if a communicable disease is suspected.

(ii)  Notification to CDC within 24 hours of the arrival of an ill animal or occurrence of any illness or death occurring in an animal.

(iii)  Examination by a USDA-accredited veterinarian immediately upon detection of illness and diagnostic testing to determine the cause of illness. All costs associated with examination and diagnostics are the responsibility of the importer.

(iv)  For any animal that dies or is euthanized due to fatal illness or injury, necropsy (gross and histopathologic examination are required), and any subsequent infectious disease testing based on gross or histopathology findings or as determined by CDC, to determine the cause of death. The importer is responsible for all costs associated with necropsy and testing.

(v)  Suspected or confirmed communicable diseases, including the presence of ectoparasites (*i.e.,* ticks and fleas), must be reported to CDC within 24 hours of identification.

Case: 25-1801    Document: 00118378350    Page: 74    Date Filed: 12/11/2025    Entry ID: 6772078
42 CFR 71.51 (up to date as of 12/04/2025)
Dogs and cats.                                                                                         42 CFR 71.51(p)(3)

(3) Upon completion of the quarantine period and before a facility releases any animal from quarantine, the facility must ensure that the facility's USDA-accredited veterinarian has verified the health status of the animal.

(4) Any report required under this paragraph must be uploaded to SAFE TraQ prior to the release of the animal.

(q) *Quarantine requirements for animals at CDC-registered animal care facilities.*

(1) A CDC-registered animal care facility must maintain a quarantine area for holding animals when quarantine is required. Foreign-vaccinated dogs that have been in a DMRVV high-risk country within six months of arrival must be quarantined for 28 days after revaccination with a USDA-licensed rabies vaccine at the facility if they do not have a valid rabies serologic test from a CDC-approved laboratory. CDC may also require quarantine or extend the quarantine period if a facility or CDC finds or suspects that an animal is infected with, or has been exposed to, a communicable disease or if CDC determines that additional diagnostic testing is warranted.

(2) For any quarantine area established or maintained under this section, a facility must establish, implement, maintain, and adhere to standard operating procedures that meet the following physical security requirements:

(i) The CDC-registered animal care facility must be locked and secure, with access limited to authorized and trained personnel.

(ii) A CDC-registered animal care facility must limit access to animal quarantine areas to authorized personnel responsible for the transport, care, or treatment of the animals.

(3) During the quarantine period, a CDC-registered animal care facility must monitor animals for signs of any communicable disease, including, but not limited to, signs consistent with rabies, brucellosis, leptospirosis, leishmaniasis, or ecto- or endoparasites.

(4) If any animals appear ill during quarantine, the CDC-registered animal care facility must, in accordance with paragraphs (p)(2)(i) through (v) of this section, ensure appropriate evaluation, monitoring, and treatment. Suspected or confirmed communicable diseases in animals must be reported to CDC within 24 hours.

(5) A CDC-registered animal care facility must not knowingly release any ill animal from quarantine under paragraph (q)(3) of this section without prior consultation with and written approval from CDC.

(6) Quarantined animals must be housed in such a manner that they do not expose other quarantined animals or non-quarantined animals (including animals other than dogs or cats) to potentially infectious materials, including soiled bedding, caging, and other potentially contaminated items. Animals in quarantine may not be housed together.

(7) If CDC notifies a CDC-registered animal care facility of any evidence that animals have been exposed to a communicable disease, the facility must, at the facility's expense (subject to reimbursement by the importer or carrier (in case of abandonment)), implement or cooperate in the CDC's implementation of additional measures to rule out the spread of suspected communicable disease before releasing an animal or shipment of animals from quarantine, including examination, additional diagnostic procedures, treatment, detention, extended quarantine, isolation, seizure, or destruction of exposed animals.

ADD_000032

(8)   A CDC-registered animal care facility must establish, implement, and adhere to standard operating procedures for safe handling and necropsy of any animal that dies in quarantine.

(r)   *Revocation and reinstatement of a CDC-registered animal care facility's registration.*

(1)   The Director may revoke a CDC-registered animal care facility's registration if the Director determines that the facility has failed to comply with any applicable provisions of this section, the facility's standard operating procedures, USDA Animal Welfare standards (9 CFR parts 1, 2, and 3), or other standards as outlined in CDC's *Technical Instructions for CDC-registered Animal Care Facilities.*

(2)   CDC will send the CDC-registered animal care facility a notice of revocation stating the grounds upon which the proposed revocation is based.

(3)   If the CDC-registered animal care facility wishes to contest the revocation, the facility must file a written response to the notice within five business days after receiving the notice.

(4)   As part of the response, a CDC-registered animal care facility may request that the Director review the written record.

(5)   If a CDC-registered animal care facility fails to file a response within five business days, all of the grounds listed in the proposed revocation will be deemed admitted, in which case the notice shall constitute final agency action, unless the Secretary, within one business day, decides to excuse the facility's failure to respond on a timely basis.

(6)   If a CDC-registered animal care facility's response is timely, the Director will review the registration, the notice of revocation, the response, and make a decision in writing based on the written record.

(7)   As soon as practicable after completing the written record review, the Director will issue a decision in writing that shall constitute final agency action, unless the Secretary, within one business day, decides to review the Director's decision. The Director will provide the facility with a copy of the written decision.

(8)   The Director may reinstate a revoked registration after inspecting the facility, examining its records, conferring with the facility, and receiving information and assurance from the facility of compliance with the requirements of this section.

(s)   *Requirement for the certification of foreign rabies vaccination and microchip form to import foreign-vaccinated dogs from DMRVV high-risk countries.*

(1)   Importers of foreign-vaccinated dogs from DMRVV high-risk countries must submit the certification of foreign rabies vaccination and microchip form to the CDC-registered animal care facility in order to make a reservation at that facility.

(2)   Importers must present documentation confirming the dog's reservation at a CDC-registered animal care facility to the airline prior to boarding and to CBP upon arrival at a U.S. port for admission of foreign-vaccinated dogs from DMRVV high-risk countries.

(3)   The certification of foreign rabies vaccination and microchip form must be truthful and accurate, completed in English, and include:

(i)   The name of the person importing the dog (consignee), physical address, phone number, email address, passport number, and date of birth;

(ii)   The owner's name, phone number, and email address;

**ADD_000033**

(iii)  The destination address (physical address) where the dog will reside upon arrival in the United States;

(iv)  The dog's name, breed, sex, date of birth or approximate age if the date of birth is unknown, and color or markings of the dog;

(v)  Rabies vaccination information for the dog administered within a timeframe and in accordance with the vaccination schedule as specified in CDC technical instructions;

(vi)  Rabies vaccine product information (product name, manufacturer, lot number, and product expiration date);

(vii)  Rabies vaccine expiration date (date when next vaccine is due), which must be after the dog's date of arrival at a U.S. port;

(viii)  Microchip number and microchip implant date, which must be on or before the date of administration of the most recent rabies vaccination included on this form;

(ix)  The name, license number or official stamp, address, telephone number, email address, and signature of the authorized veterinarian or official government veterinarian that examined the dog in the exporting country; and

(x)  The name, address, official seal or stamp, and signature of an official government veterinarian attesting that the authorized veterinarian is licensed or authorized to practice veterinary medicine in the exporting country and further attesting that the information listed on the form is true and correct.

(4)  Importers who fail or refuse to present the certification of foreign rabies vaccination and microchip form or present a form that is untruthful, inaccurate, and incomplete may result in the dog being denied admission and returned to the country of departure pursuant to paragraph (v) of this section.

(t)  *Requirement for Certification of U.S.-Issued Rabies Vaccination form for importers seeking to import U.S.-vaccinated dogs from DMRVV high-risk countries.*

(1)  Importers returning to the United States with a U.S.-vaccinated dog that has been in a DMRVV high-risk country within the last six months may present their dog for admission without a rabies serologic test from a CDC-approved laboratory, without the dog undergoing veterinary examination (unless ill, injured, or exposed), and without revaccination against rabies or quarantine at a CDC-registered animal care facility upon arrival under the following circumstances:

(i)  The importer presents a certification of U.S.-issued rabies vaccination form that is truthful, complete, and accurate.

(ii)  The importer presents a valid certification of U.S.-issued rabies vaccination form that sufficiently and reliably demonstrates that a USDA-licensed rabies vaccine was administered within a timeframe and age parameters as specified in CDC technical instructions.

(2)  The certification of U.S.-issued rabies vaccination form must have been completed and endorsed prior to the dog leaving the United States and cannot be completed upon arrival at a U.S. port or after the dog has left the United States.

ADD_000034

(3) Importers returning to the United States from a DMRVV high-risk country with their U.S.-vaccinated dog that are unable to meet the requirements of this paragraph shall have the dog treated as if it was vaccinated in a foreign country in accordance with the provisions of paragraphs (k) and (s) of this section or, alternatively, have the dog denied admission and returned to the country of departure pursuant to the paragraph (v) of this section.

(4) If an importer fails to immediately (within 24 hours of arrival) arrange for the dog's return to the country of departure, then the animal will be considered abandoned pursuant to paragraph (aa) of this section.

(u) *Requirement for proof that a dog has been only in DMRVV low-risk or DMRVV-free countries.*

(1) Dogs arriving, including those returning to the United States, from a DMRVV low-risk or DMRVV-free country may be admitted into the United States subject to the requirements in this section if the importer submits written documentation satisfactory to the Director that for the six months before arrival, the dog has been only in DMRVV low-risk or DMRVV-free countries.

(2) For purposes of paragraph (u)(1) of this section, written documentation satisfactory to the Director shall include any one of the following:

(i) A valid certification of foreign rabies vaccination and microchip form if completed in a DMRVV-free or DMRVV low-risk country and the dogs are arriving into the United States from the same DMRVV-free or DMRVV low-risk country as that listed on the form. This form must be completed by an authorized veterinarian, which may include an official government veterinarian, and must be certified by an official government veterinarian in the exporting country;

(ii) A valid certification of U.S.-issued rabies vaccination form completed by a USDA-accredited veterinarian and endorsed by a USDA official veterinarian;

(iii) A valid USDA export certificate if the certificate is issued to allow the dogs to travel to a DMRVV-free or DMRVV low-risk country and the dogs are returning to the United States from the same DMRVV-free or DMRVV low-risk country as that listed on the export certificate. The form must be completed by a USDA-accredited veterinarian and endorsed by a USDA official veterinarian;

(iv) A valid foreign export certificate from a DMRVV-free or DMRVV low-risk country that has been certified by an official government veterinarian in that country. The export certificate must be accompanied by veterinary records (such as the European Union pet passport) or proof of payment for veterinary services establishing that veterinary services were performed in the exporting country at least six months before traveling to the United States;

(v) A certification of dog arriving from DMRVV-free or DMRVV low-risk country form if accompanied by veterinary records or proof of payment for veterinary services establishing that veterinary services were performed in the same DMRVV-free or DMRVV low-risk country at least six months before travel to the United States. This form must be completed by an authorized veterinarian, which may include an official government veterinarian, and must be certified by an official government veterinarian in the exporting country; or

(vi) Other records or documents satisfactory to the Director that CDC may establish through technical instructions and publish on its website.

(v) *Denial of admission of dogs and cats.*

ADD_000035

**42 CFR 71.51 (up to date as of 12/04/2025)**
Dogs and cats.

**42 CFR 71.51(v)(1)**

(1)   The following categories of animals are inadmissible to the United States:

(i)   Any dog arriving from a DMRVV low-risk or DMRVV-free country without written documentation satisfactory to the Director that the dog has been only in DMRVV low-risk or DMRVV-free countries during the six months prior to the attempted entry, or if the Director reasonably suspects fraud.

(ii)   Any dog that is not accompanied by a receipt confirming that a CDC dog import form has been submitted to CDC through a CDC-approved system.

(iii)   Any dog arriving by air for which a bill of lading, including an air waybill, has not been created by the airline prior to the dog's arrival in the United States (regardless of the value of the shipment) unless the airline transporting the dog has been granted a waiver pursuant to paragraph (dd) of this section and the airline's handling and transport of the dog is consistent with the terms of that waiver.

(iv)   Any unvaccinated or foreign-vaccinated dog arriving by land to the United States if the dog has been in a DMRVV high-risk countries within the last six months.

(v)   Any unvaccinated or foreign-vaccinated dog arriving by sea to the United States if the dog has been in a DMRVV high-risk country within the last six months, except for a foreign-vaccinated dog qualifying as a service animal and meeting the standards set forth in paragraph (d)(5) of this section.

(vi)   Any animal imported by an importer who refuses to comply with the requirements (if applicable) for disease surveillance screening, microchip scanning, veterinary examination, diagnostics tests to rule out communicable diseases, revaccination, providing proof of sufficient rabies serologic tests, or quarantine (if applicable) at a CDC-registered animal care facility or other CDC-approved facility (if a CDC-registered animal care facility is not available) upon arrival.

(vii)   Any dog that has been in a DMRVV high-risk country within the last six months and arrives without a valid certification of U.S.-issued rabies vaccination form or a valid certification of foreign rabies vaccination and microchip form.

(viii)   Any foreign-vaccinated dog that has been in a DMRVV high-risk country within the last six months and does not arrive via air at a U.S. airport with a CDC quarantine station and a CDC-registered animal care facility, except for a foreign-vaccinated dog arriving by sea that qualifies as a service animal and meets the standards set forth in paragraph (d)(5) of this section.

(ix)   Any dog imported from a DMRVV high-risk country that arrives without a reservation at a CDC-registered animal care facility (if applicable).

(x)   Any dog from a DMRVV-restricted country that arrives without a valid CDC dog import permit.

(xi)   Any dog, regardless of country of departure, if the Director reasonably suspects fraud in any documentation required for admission or if such documentation is otherwise untruthful, inaccurate, or incomplete.

(xii)   Any animal, regardless of country of departure, that poses a public health risk, including animals that appear unhealthy upon arrival or demonstrate signs or symptoms of communicable disease.

(xiii)   Any dog under six months of age that arrives in the United States.

**ADD_000036**

(xiv) Any dog that arrives in the United States without a microchip or without its microchip number documented on the importation paperwork required by CDC.

(2) An importer must meet the admission requirements of all U.S. government agencies for the admission of an animal into the United States. Satisfaction of CDC's requirements for the admission of animals does not fulfill the admission requirements of other U.S. government agencies.

(w) *Dogs and cats awaiting an admissibility determination or return to their country of departure.*

(1) Animals arriving by air that are denied admission and awaiting return to their country of departure or awaiting a determination as to their admissibility must be held in a CDC-registered animal care facility or other CDC-approved facility (if a CDC-registered animal care facility is not available) in such a way as to prevent the potential spread of communicable diseases.

(2) An airline must arrange to transport an animal arriving by air to a CDC-registered animal care facility (or other boarding, kennel, or veterinary clinic approved by CDC if a CDC-registered animal care facility is not available) if the animal is denied admission and is awaiting return to its country of departure or is awaiting a determination of its admissibility. If the animal is apparently healthy, the airline must transport the animal (by a CBP-bonded transporter) within 12 hours of its arrival.

(3) An airline must immediately report an obviously ill or injured animal (*e.g.,* the animal is unable to stand, has difficulty breathing, is bleeding, has broken bones or disfigured limbs, or is experiencing seizures, vomiting, or discharge from the nose, mouth, or eyes) arriving into the United States to the CDC quarantine station of jurisdiction. The airline must immediately arrange to transport an obviously ill or injured animal by a CBP-bonded transporter to a CDC-registered animal care facility or veterinary clinic as directed by CDC.

(4) Animals arriving by sea that are denied admission must remain on the vessel while awaiting return to the country of departure.

(x) *Disposal or disposition of dogs and cats denied admission to the United States.*

(1) Animals shall be subject to such additional requirements as authorized under this part or 42 CFR part 70 as may be deemed necessary by the Director to protect the public's health, including suspension of entry under § 71.63.

(2) Animals denied admission to the United States that were transported to the United States via air must be returned by the airline to the country of departure at the importer's expense on the next available outbound flight (no later than 72 hours after arrival), regardless of airline or route, if fit to travel. Pending the animal's return, the animal shall be detained at the importer's expense in the custody of the carrier at a CDC-registered animal care facility (or other boarding, kennel, or veterinary clinic approved by CDC if a CDC-registered animal care facility is not available).

(3) Animals denied admission to the United States that were transported to the United States via sea shall be reembarked immediately by the vessel's master or operator and returned to their country of departure on the next voyage.

(4) Animals denied admission to the United States that were transported to the United States via land shall be returned immediately by importer or carrier to their country of departure.

(5) If an animal is not fit to travel, poses a public health risk, or would pose a risk to other animals, then the carrier shall arrange for the animal to be transported to a CDC-registered animal care facility or a CDC-approved veterinary clinic (if a CDC-registered animal care facility is not available) for housing

ADD_000037

and treatment by a licensed veterinarian until approved for travel by CDC or humanely euthanized (*e.g.,* under circumstances where the animal is fatally ill or injured) by a licensed veterinarian. The importer shall be responsible for all costs associated with the denial, veterinary evaluation, care, or disposal of the animal. If the importer refuses to pay for any costs associated with the denial, evaluation, care, or disposal of the animal, then it will be considered abandoned, and the carrier shall assume custody and financial responsibility for these costs.

(6) If humane euthanasia is recommended by a veterinarian or chosen by an importer or carrier (*e.g.,* under circumstances where the animal is fatally ill or injured), the animal must be euthanized by a U.S.-licensed veterinarian in accordance with American Veterinary Medical Association guidelines. Euthanasia does not relieve carriers or importers of the obligation to arrange and pay for testing and necropsy required by CDC.

(7) The Director may grant temporary extensions of returns for animals that are not fit for travel as determined by a CDC veterinarian, but the importer (or carrier in the case of abandonment) must arrange for the return of the animal to its country of departure as soon as CDC notifies the carrier that the animal is fit for travel.

(8) The requirements of this paragraph shall additionally apply to dogs or cats abandoned by the importer prior to the dogs' or cats' admission into the United States. A dog or cat may be deemed abandoned pursuant to the provisions of paragraph (aa) of this section.

(9) Carriers must provide transportation to/from and holding at a CDC-registered animal care facility or another CDC-approved facility (if a CDC-registered animal care facility is not available) while the animal is pending an admissibility determination, undergoing veterinary evaluation or care, or upon denial of entry. Carriers may require reimbursement from an importer for any costs incurred on behalf of the importer.

(10) Importers must comply with CDC requirements for the return of an animal or for the veterinary assessment of an animal. Refusal to cooperate, including refusal to pay any associated veterinary fees, will result in the animal being considered abandoned by the importer, and custody of the animal will be transferred to the carrier who will assume financial responsibility for costs relating to the denial, evaluation, care, or disposal of the animal.

(11) A carrier may enter into contractual arrangements with an importer or a third party relating to the expenses of returning an animal to its country of departure, for veterinary care, or otherwise disposing of an animal, provided that no government costs are incurred. The return of an animal to its country of departure or the initiation of veterinary care shall not be delayed while the carrier attempts to enter into or negotiate contractual arrangements.

(12) The provisions of this paragraph may be applied to importers of animals and to carriers transporting such animals in circumstances where an animal is denied entry at a land port or seaport of the United States and the animal cannot be immediately returned to its country of departure (*e.g.,* because it is unfit to travel).

(y) *Appeals of CDC denials to admit a dog or a cat upon arrival into the United States.*

(1) If CDC denies admission to an animal upon arrival, then the importer may appeal that denial to the Director.

(2) The importer must submit the appeal in writing to the Director, stating the reasons for the appeal and demonstrating that there is a genuine and substantial issue of fact in dispute.

ADD_000038

Case: 25-1801    Document: 00118378350    Page: 81    Date Filed: 12/11/2025    Entry ID: 6772078

**42 CFR 71.51 (up to date as of 12/04/2025)**
**Dogs and cats.**
            **42 CFR 71.51(y)(3)**

    (3)  The importer must submit the appeal within one (1) business day of the denial by emailing *CDCAnimalImports@cdc.gov*.

    (4)  Submitting an appeal will not delay the return of the animal to the country of departure.

    (5)  The Director will issue a written response to the appeal, which shall constitute final agency action, unless the Secretary, within one (1) business day, decides to review the Director's decision.

(z)  *Record of death of dogs and cats en route to the United States and disposition of dead animals.*

    (1)  Carriers shall maintain a record of the death of animals occurring while *en route* to the United States and shall submit the record to the CDC quarantine station of jurisdiction for the U.S. port upon arrival.

    (2)  Animals that become sick or die *en route* or are identified as sick or dead upon arrival shall be separated from other animals (including animals other than dogs or cats) as soon as the sickness or death is discovered and shall be held in confinement pending any necessary examination as determined by the Director. Sick animals shall be examined pursuant to the provisions of paragraph (j) of this section or disposed of pursuant to the provisions of paragraph (x) of this section.

    (3)  The carrier shall arrange for any animals that die *en route* to the United States or that die while detained pending determination of their admissibility to undergo a necropsy (gross and histopathologic examination are required), and any subsequent infectious disease testing based on gross or histopathology findings or as determined by CDC. The carrier or CDC-registered animal care facility must contact the CDC quarantine station of jurisdiction prior to transporting an animal for necropsy to determine whether rabies testing is required. In the event an importer abandons an animal, the carrier will become the owner and shall assume responsibility for all expenses described in this paragraph.

    (4)  The carrier shall send copies of the final necropsy report and all test results to the CDC quarantine station of jurisdiction.

    (5)  Pursuant to paragraphs (p) and (x) of this section, the importer is responsible for costs associated with the necropsy, testing, and disposal of the body. In the event an importer abandons an animal, then pursuant to paragraph (aa) of this section, the carrier will become the owner and shall assume responsibility for all expenses described in this paragraph.

(aa)  *Abandoned shipments of dogs and cats.*

    (1)  In the event an importer abandons an animal under this section, the carrier will become the owner and shall assume responsibility for all expenses described in this section.

    (2)  An animal shipment will be deemed abandoned under the following circumstances:

        (i)  when explicitly stated by the importer verbally or in writing to the carrier, CDC, or CBP; or

        (ii)  if the importer fails to cooperate with or respond to the carrier's attempts to comply with the provisions of this section within 24 hours; or

        (iii)  if the importer refuses payment within 24 hours for CDC-mandated examinations, testing, holding, or treatment needed to ensure the safe importation of dogs and cats into the United States.

(bb) *Sanitation of cages and containers of dogs and cats.* When the Director finds that the cages or other containers of animals arriving in the United States are in an unsanitary or other condition that may constitute a communicable disease risk, the animals shall not be admitted in such containers unless the carrier has the containers cleaned and disinfected or the animals are removed and placed in clean containers in accordance with USDA and, in the case of airlines, the International Air Transport Association shipping requirements. Discarded containers must be cleaned and disinfected or destroyed in accordance with carrier policies. CDC may require documentation of container disinfection or destruction by the carrier.

(cc) *Requirements for in-transit shipments of dogs and cats.*

(1) In-transit shipments of live animals are not eligible for release into the United States and may only be transported as cargo and not as hand-carried baggage or checked/excess baggage.

(2) In-transit shipments must be maintained under continuous confinement with USDA APHIS oversight on board a conveyance until export, or off-loaded and maintained under continuous confinement and APHIS oversight at a USDA APHIS-preapproved holding facility with a CBP-issued FIRMS code while awaiting a connecting conveyance, and then loaded and maintained under USDA APHIS oversight on board the connecting conveyance until export.

(3) The provisions of this section shall apply to animals transiting through the United States from one foreign country to another, except as provided below:

(i) Animals that appear healthy but have been exposed to a sick or dead animal (including an animal other than a dog or cat) suspected of having a communicable disease are not required to undergo examination or tests as provided in paragraph (j) of this section if the Director determines that the conditions under which the animals are being transported afford adequate protection against introduction of communicable disease into the United States.

(ii) The certification of foreign rabies vaccination and microchip form, certification of U.S.-issued rabies vaccination form, certification of dog arriving from DMRVV-free or DMRVV low-risk country form, or CDC dog import form is not required for dogs that are transported by aircraft and are being transited through the United States if retained in the custody of the airline under conditions that would prevent transmission of communicable diseases.

(iii) There is no minimum age requirement for dogs that are transported by aircraft and are being transited through the United States if retained in the custody of the airline under conditions that would prevent transmission of communicable diseases.

(iv) A microchip is not required for dogs that are transported by aircraft and are being transited through the United States if retained in the custody of the airline under conditions that would prevent transmission of communicable diseases.

(dd) *Bill of lading and other airline requirements for dogs.*

(1) Airlines are required to create a bill of lading, which includes air waybills (AWB), for all dogs arriving in the United States prior to arrival. This includes dogs transported as cargo, checked-baggage, or hand-carried baggage.

(2) Airlines that lack the technical ability to generate a bill of lading to transport dogs as checked baggage or as hand-carried baggage may request a waiver from CDC by emailing *cdcanimalimports@cdc.gov.*

ADD_000040

(i) The airline's request for a waiver must be accompanied by a written standard operating procedure (SOP) describing how the airline will ensure care, transportation, and housing for any ill, injured, or abandoned animals in the absence of a bill of lading. The SOP must also identify and provide the location of a CDC-registered animal care facility or other suitable alternative approved by CBP and CDC that will provide care and suitable housing for any ill, injured, or abandoned animals prior to any animals being transported to the United States.

(ii) As a condition of granting a waiver, CDC may require the airline to obtain the services of a licensed U.S. customs broker who will be responsible for coordinating on behalf of the airline the entry and clearance of any dogs imported into the United States, including compliance with CDC's requirements relating to the admission of dogs.

(iii) As a condition of granting a waiver, CDC may require the airline to provide a timetable and identify steps that the airline will take to develop the technical capacity to generate an AWB (or another suitable alternative to an AWB) to transport dogs as cargo, checked-baggage, or hand-carried baggage.

(iv) The Director may revoke a waiver granted to an airline upon notice to the airline and a finding that an airline has acted inconsistent with the terms of the waiver, including any provision of its SOP.

(v) CDC may publish additional technical instructions on its website for airlines seeking a waiver from the bill of lading requirement.

(3) Any dog arriving by air for which a bill of lading, including an AWB, has not been created by the airline prior to the dog's arrival in the United States will be denied admission and returned to the country of departure pursuant to paragraph (v) of this section, unless the airline transporting the dog has been granted a waiver and the airline's handling and transport of the dog are consistent with the terms of that waiver.

(4) Airlines must deny boarding to any dogs for which the importer: has not presented to the airline before boarding a receipt confirming submission of the CDC dog import form; if the dogs are scheduled to arrive at a different U.S. port than the one listed on the receipt of the CDC dog import form; or if the dogs presented for travel do not match the description on the receipt of the CDC dog import form.

(5) For U.S.-vaccinated dogs that have been in a DMRVV high-risk country within the last six months, airlines must deny boarding unless the importer presents prior to boarding a valid certification of U.S.-issued rabies vaccination form or if the dogs presented for travel do not match the description on the certification of U.S.-issued rabies vaccination form.

(6) For foreign-vaccinated dogs that have been in a DMRVV high-risk country within the last six months, airlines must deny boarding unless the importer presents documentation to the airline before boarding of a reservation at a CDC-registered animal care facility and the dog is scheduled to arrive in the United States at the U.S. airport where the CDC-registered animal care facility is located.

(7) For dogs from DMRVV-free or DMRVV low-risk countries, airlines must deny boarding unless the importer before boarding presents documentation as described in paragraphs (g)(2) and (u)(2) demonstrating that the dog is over six months of age, has a microchip, and has been only in DMRVV low-risk or DMRVV-free countries during the last six months. Airlines must also deny boarding if the dog presented for travel does not match the description on the documents presented by the importer for travel.

ADD_000041

(8) A representative of an airline transporting live dogs into the United States must be on-site at the U.S. airport and available to coordinate the entry/clearance of the dogs with Federal government officials until all live dogs transported on an arriving flight into the United States have either been cleared for entry or arrangements have been made to transport the dogs to a CDC-registered animal care facility or other facility (*e.g.,* veterinary clinic or kennel) approved by CDC pending an admissibility determination.

(ee) *Order prohibiting carriers from transporting dogs and cats.*

(1) If the Director determines that a carrier has endangered the public health of the United States by acting or failing to act to prevent the introduction of DMRVV, as would occur through failure to comply with any applicable provisions of this section, the Director may issue an order revoking the carrier's permission to transport live animals into the United States, which shall be served on the carrier's owner or operator.

(2) The Director may rescind the order after inspecting the carrier's facilities; examining its records; conferring with the carrier's owners or operators, its contractors, or staff; or receiving information and written assurances from the carrier owner or operator that it has taken remedial steps to ensure future compliance with the requirements of this section.

(3) A carrier owner or operator may appeal a revocation of a carrier's permission to transport live animals into the United States. The appeal shall be in writing, addressed to the Director, state the reasons for the appeal, and demonstrate that there is a genuine and substantial issue of fact in dispute. The appeal must be submitted via email to *CDCanimalimports@cdc.gov*.

(4) As soon as practicable after completing the written record review, the Director will issue a decision in writing that shall constitute final agency action, unless the Secretary, within one business day, decides to review the Director's decision. The Director will serve the carrier with a copy of the written decision.

(ff) *Prohibition on imports of dogs from DMRVV-restricted countries.*

(1) The Director may prohibit or otherwise restrict the import of dogs into the United States from certain countries designated as DMRVV-restricted countries. CDC will maintain a list of DMRVV-restricted countries based on the countries' prior export of dogs infected with DMRVV to any other countries within a time frame determined by CDC or based on inadequate controls, as determined by CDC, in the countries to monitor and prevent the export of dogs to the United States with falsified or fraudulent rabies vaccine credentials, invalid rabies vaccination certificates, or other fraudulent, inaccurate, or invalid exportation/importation documents.

(2) DMRVV-restricted countries may be subject to additional restrictions, including a complete prohibition on the importation of dogs into the United States from those countries as needed to prevent the reintroduction of DMRVV.

(3) The Director may maintain such additional restrictions or prohibitions in place until the Director is satisfied that the DMRVV-restricted country has established sufficient controls to prevent the reintroduction of DMRVV into the United States, including measures to prevent the use of falsified or fraudulent vaccine credentials or invalid rabies vaccination certificates.

(4) The addition or removal of DMRVV-restricted countries from the list shall be announced through notice in the FEDERAL REGISTER, and a list will be maintained on CDC's website.

(5)  Notwithstanding the prohibition on imports of dogs from DMRVV-restricted countries, the Director may allow the importation of dogs for scientific purposes, when used as service animals (as defined in 14 CFR 382.3) for individuals with disabilities, or in furtherance of an important government interest. In such instances CDC will issue a CDC dog import permit for the importation of dogs from DMRVV-restricted countries. Instructions for how to apply for a permit will be included in CDC technical instructions.

(gg)  *Request for issuance of additional fines or penalties.*

(1)  CDC may request that CBP, pursuant to 19 U.S.C. 1592 and 19 U.S.C. 1595a, issue additional fines, citations, or penalties to importers, brokers, or carriers when the Director has reason to believe that an importer, broker, or carrier has violated any of the provisions of this section or otherwise engaged in conduct contrary to law.

(2)  CDC may request that the U.S. Department of Justice investigate, and if determined appropriate based on the outcome of such investigation, prosecute any person who the Director has reason to believe may have violated Federal law, including by forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with a U.S. government employee while engaged in or on account of the performance of their official duties in violation of 18 U.S.C. 111, by obstructing an agency proceeding in violation of 18 U.S.C. 1505, or by otherwise engaging in conduct contrary to law.

*(Approved by the Office of Management and Budget under control number 0920-0134)*

*[50 FR 1519, Jan. 11, 1985, as amended at 89 FR 41837, May 13, 2024]*